SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION

------------------------------------- X

NEWMAN CAPITAL LLC,

               Plaintiff,

   -against-

PRIVATE CAPITAL GROUP, INC.; SELECT
FUND MANAGEMENT LLC; JARED
LUCERO; MICHAEL BURKE; REEF
CAPITAL PARTNERS LLC; COMMON
INVESTMENT FUND LLC; REEF-PCG LLC;
STILLWATER EQUITY PARTNERS LLC;
REEF CAPITAL INVESTMENT LLC; REEF
CAPITAL MANAGEMENT LLC; REEF
INVESTMENT MANAGEMENT LLC;
CANYON ACCOUNTING LLC; PCG
SELECT SERIES I LLC; PCG SELECT
SERIES II LLC; PCG SELECT SERIES
SECURED LLC; PCG SELECT SERIES
OFFSHORE I LP; SFM CREDIT FUND
OFFSHORE I LP; SFM SECURED CREDIT II
LLC; and RIM SECURED CREDIT INCOME
FUND III LLC,

               Defendants,

   and

PCG CREDIT PARTNERS LLC; PCG
HOLDINGS LLC; 160 W CANYON CREST
ROAD LLC; 1705 VIEWPOINT LLC;
OUTLAW COUNTRY HOLDING LLC; IRON
FOX BALLARD LLC; BROOKSIDE
PRAIRIE VIEW LLC,

               Nominal Defendants.

------------------------------------- X

Index No.: 655851/2019

**AMENDED COMPLAINT**

Plaintiff Newman Capital LLC ("Newman Capital"), by and through its undersigned

counsel, for its Amended Complaint against defendants Private Capital Group, Inc. ("PCG"),

Select Fund Management LLC ("SFM"), Jared Lucero ("Lucero"), Michael Burke ("Burke"), Reef Capital Partners LLC ("Reef Capital Partners"), Common Interest Fund LLC ("Common Interest Fund"), Reef-PCG LLC ("Reef-PCG"), Stillwater Equity Partners LLC ("Stillwater"), Reef Capital Investment LLC ("Reef Capital Investment"), Reef Capital Management LLC ("Reef Capital Management"), Reef Investment Management LLC ("Reef Investment Management"), Canyon Accounting LLC ("Canyon Accounting"), PCG Select Series I LLC ("PCG Series I"), PCG Select Series II LLC ("PCG Series II"), PCG Select Series Secured LLC ("PCG Secured"), PCG Select Series Offshore I LP ("PCG Offshore"), SFM Credit Fund Offshore I LP ("SFM Offshore"), SFM Secured Credit II LLC ("SFM II"), RIM Secured Credit Income Fund III LLC ("RIM Secured III"), and nominal defendants PCG Credit Partners LLC ("PCG Credit Partners"), PCG Holdings LLC ("PCG Holdings"), 160 W Canyon Crest Road LLC ("160 W Canyon Crest Road"), 1705 Viewpoint LLC ("1705 Viewpoint"), Outlaw Country Holding LLC ("Outlaw Country Holding"), Iron Fox Ballard LLC ("Iron Fox Ballard"), and Brookside Prairie View LLC ("Brookside Prairie View"), respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      This case focuses on (a) the refusal to pay plaintiff, Newman Capital, certain investment banking and associated advisory fees to which Newman Capital was and is contractually entitled; (b) the fraudulent transfer of assets in an effort to avoid paying these investment banking and associated fees, as well as; (c) the interference with Newman Capital's agreements through which these fees should have been paid; and (d) the unjust enrichment of those parties who benefitted by the malfeasance described herein.

2.      PCG was, at relevant times referred to herein, a real estate private lending company that used Newman Capital to introduce them to accredited investors.

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

3.      In some instances these introductions resulted in investments placed with PCG or its affiliates, including without limitation, the Known Affiliates (as defined below), and pursuant to certain written advisory and non-circumvention agreements (collectively, the "Agreements") PCG, and later SFM and their assigns, became obligated to pay to Newman Capital a contractually-established investment banker fee, among other fees.

4.      At the request of PCG. SFM, and/or the Known Affiliates, for access to capital providers, Newman Capital introduced them to, among others, a family office of the Bass family that does business through an investment arm known as Crestline Investors, Inc. ("Crestline").

5.      As a direct result of Newman Capital's introduction and efforts, Defendants obtained more than $100 million in investments from Crestline and, upon information and belief, more from other introductions.

6.      Yet, after receiving these substantial benefits (which transformed Defendants' businesses, including by permitting them to extend loans of $20 million or more, rather than as previously limited to loans of only $2 to $5 million), and in violation of the clear and unambiguous requirements of the Agreements, PCG, SFM, and/or the Known Affiliates unjustifiably refused to pay the millions of dollars of contractually agreed-upon fees, but worse yet, the Known Affiliates, Lucero and Burke, as shown in internal e-mails between Lucero and Burke just recently discovered, have engaged in the improper and fraudulent transfer of assets expressly designed to avoid Newman Capital's claims, tortuously interfered with the obligations of PCG and SFM under the Agreements and have otherwise been unjustly enriched by their malfeasance.

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

Case 1:22-cv-00663-VSB   Document 5-5   Filed 01/26/22   Page 4 of 73

## THE PARTIES AND RELEVANT NON-PARTIES

7.     Newman Capital is a New Jersey limited liability company, with its principal place of business in New York, New York. Newman Capital is registered to do business in New York, New York.  Stephen Newman is the Chief Executive Officer and sole managing member of Newman Capital. Stephen Newman (through Newman Capital) provides financial advisory and investment banking services, through Newman Capital's broker/dealer, to early-stage companies.

8.     PCG is a Utah corporation, with its principal place of business in Alpine, Utah. PCG is a private real estate lending company. Upon information and belief, in 2014-2018, Lucero and Burke, and perhaps others, engineered a transfer of PCG's business and assets to PCG Series I and Reef-PCG.

9.     SFM is a Delaware limited liability company, with its principal place of business in Alpine, Utah. Upon information and belief, SFM was created by PCG as a spin-off to relieve some of PCG's existing high net worth clientele of the burden of portfolio management via a diversified fund vehicle which would invest in each loan originated by PCG. Upon further information and belief, SFM is the primary capital provider of real estate loans sourced and serviced by Reef-PCG.

10.     Lucero is an individual and a resident of Utah, and controls each of the Defendants and Nominal Defendants.

11.     Burke is an individual and a resident of Utah, and controls each of the Defendants and Nominal Defendants.

12.     Reef Capital Partners is a Delaware limited liability company with its principal place of business in Alpine, UT. Upon information and belief, Reef Capital Partners is a wholly owned subsidiary of Common Interest Fund.

13.     Common Interest Fund is a Utah limited liability company with its principal place of business in Alpine, UT.

14.      Reef-PCG is a Utah limited liability company with its principal place of business in Alpine, UT. Upon information and belief, PCG was renamed Reef-PCG. Reef-PCG is still doing business as PCG.

15.     Stillwater Equity Partners is a Utah limited liability company with its principal place of business in Alpine, UT.

16.     Reef Capital Investment is a Utah limited liability company with its principal place of business in Alpine, UT.

17.     Reef Capital Management is a Utah limited liability company with its principal place of business in Alpine, UT.

18.     Reef Investment Management is a Delaware limited liability company with its principal place of business in Alpine, UT.

19.     Canyon Accounting is a Utah limited liability company with its principal place of business in Alpine, UT.

20.     PCG Series I is a Delaware limited liability company with its principal place of business in Alpine, UT.

21.     PCG Series II is a Delaware limited liability company with its principal place of business in Alpine, UT.

22.   PCG Secured is a Delaware limited liability company with its principal place of business in Alpine, UT.

23.   PCG Offshore is a Cayman Islands limited partnership with its principal place of business in Alpine, UT.

24.   SFM Offshore is a Cayman Islands limited partnership with its principal place of business in Alpine, UT.

25.   SFM II is a Delaware limited liability company with its principal place of business in Alpine, UT.

26.   RIM Secured III is a Delaware limited liability company with its principal place of business in Alpine, UT.

27.   PCG Credit Partners is a Delaware limited liability company with its principal place of business in Alpine, UT.

28.   PCG Holdings is a Utah limited liability company with its principal place of business in Alpine, UT.

29.   160 W Canyon Crest Road is a Utah limited liability company with its principal place of business in Alpine, UT.

30.   1705 Viewpoint is a Utah limited liability company with its principal place of business in Alpine, UT.

31.   Outlaw Country Holding is a Utah limited liability company with its principal place of business in Alpine, UT.

32.   Iron Fox Ballard is a Utah limited liability company with its principal place of business in Alpine, UT.

33.    Brookside Prairie View is a Utah limited liability company with its principal place of business in Alpine, UT.

34.    Reef Capital Partners, Common Interest Fund, Reef-PCG, Stillwater, Reef Capital Investment, Reef Capital Management, Reef Investment Management, Canyon Accounting, PCG Series I, PCG Series II, PCG Secured, PCG Offshore, SFM Offshore, SFM II and RIM Secured III are collectively at times referred to herein as the "Known Affiliates," and collectively at times with PCG, SFM, Lucero and Burke as the "Defendants."

35.    The Nominal Defendants were each owned in whole or in part by PCG at the relevant times referred to herein and are named herein for the purpose of including them in any injunctive relief that the Court may order prior to, after, or as part of any judgment herein.

36.    At the time PCG (and SFM) contracted with Newman Capital for the provision of capital placements with PCG, WaveCrest Securities LLC ("WaveCrest") served as the FINRA- and SEC-registered broker/dealer for Newman Capital's sole managing member, Stephen Newman.

37.    PCG has justified its nonpayment, in part, on its claim that certain transactions were entered into with one or more of the Known Affiliates, or yet to be identified affiliates. However, the Known Affiliates are nothing more than alter egos, if not successors, to PCG. PCG has merely played a shell game of company names in order to deprive Newman Capital of its earned fee. At the center of this shell game are the individual defendants, Jared Lucero and Michael Burke, whose individual actions in utilizing the corporate defendants to avoid payment to Newman Capital, require piercing the corporate veil, thereby subjecting them to individual/personal liability.

38.    At all times relevant to the present litigation, each Defendant was acting as agent of the other in the scheme to avoid paying amounts due Newman Capital under the agreements described herein below.

## JURISDICTION

39.    Jurisdiction is proper in this court pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules. ("CPLR").

40.    The parties' contractual relationship arises from a February 14, 2012 meeting between representatives of Newman Capital and PCG in New York, New York. The principals of PCG traveled to New York for the purpose of meeting with Newman Capital, at the offices of Matrix Capital Group, Inc., the then-broker/dealer of the sole managing member of Newman Capital, Stephen Newman, to explore a potential arrangement whereby Newman Capital would introduce PCG to investors.    Since PCG engaged Newman Capital for this purpose, representatives of those companies have traveled to New York, New York more than 15 times, including to meet potential investors to whom Newman Capital introduced them.

41.    Moreover, the parties selected New York law to apply to all of their applicable agreements. In addition, demonstrating further that PCG (and SFM) sought to avail themselves of the protections of this State, one of the parties' agreements expressly *requires* that this action be filed in this Court. *See* Ex. B, §9 ("Any legal action arising out, relating to [sic], this Agreement, and/or any amendment thereto shall be instituted in the state or federal courts sitting in the Borough of Manhattan, State of New York.").

42.    Venue is appropriate in this Court pursuant to CPLR §§ 501 and 503, and by agreement of the parties.

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

## BACKGROUND

43.     Newman Capital's core business is raising capital for early stage companies. Newman Capital does this by connecting its clients, which Newman Capital vets as potential investment targets, with high-net-worth individual investors, hedge funds, family offices, private equity firms, venture capital firms and the like, with whom Newman Capital has business relations.

44.     Newman Capital's contacts and good will within the investment community are proprietary to Newman Capital.

45.     Newman Capital maintains a clear record of its target-investor connections. Once a connection is made, Newman Capital registers it on its investment banking list, which is shared with the investment target and, as explained further below, becomes part of their written agreements. Importantly, even if an investor is not interested in an investment opportunity, if Newman Capital was the first person to introduce the target to the investor, the connection remains on the investment banking list for the term of the agreement, including any tail period. This way, the parties are aware, and there is a record of, to whom Newman Capital introduced the target. If an investor on the list closes an investment within the lifetime of the relevant agreement, per the contractual terms, Newman Capital is contractually to receive a portion of the investment as an investment banker fee.

46.     Newman Capital is not a member firm of FINRA or the SEC and is not permitted to close securities transactions and must do so with the assistance of a FINRA-and SEC-registered broker/dealer.

47.    Thus, prior to any closing of a securities transaction, any advisory fee agreement signed by Newman Capital would be assigned, by way of example, as happened here, to WaveCrest, Newman Capital's then-FINRA and SEC-registered broker/dealer.

48.    In this instance, in 2012, Defendants needed access to capital and were referred to Newman Capital in February 2012 by a mutual relationship, Matthew Gilbert (who now works for PCG) because of Newman Capital's connections in the investment community.

49.    After several months of discussions, the parties memorialized their agreement that Newman Capital would identify potential investors for Defendants, introduce them, and if Defendants closed an investment, Newman Capital would be paid an investment banker fee.

50.    In all, the Defendants signed eight relevant and interrelated agreements which are, at times, collectively referred to herein as the "Agreements" and, as described below, include non-disclosure and non-circumvention agreements with one advisory fee/engagement agreements executed in May/October 2013, September 2014, January 2017, and March 2018.

## The 2013 Agreements

51.    To protect the value of Newman's business contacts to which Defendants desired access, on May 30, 2013, Newman Capital entered into a Non-Disclosure and Non-Circumvention Agreement with "Jared L. Lucero of Private Capital Group, Inc and its affiliates, associates, subsidiaries, employees, officers, directors, and assigns" (the "2013 NDNCA").

52.    A true and correct copy of the 2013 NDNCA is annexed hereto as Exhibit A.

53.    The 2013 NDNCA was signed *before* Newman Capital provided to Defendants potential investor contacts.

54.    The 2013 NDNCA (i) governs the confidential exchange of "information with respect to certain contacts, properties, development sites and proprietary business information."

10

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

and (ii) provides that Lucero and PCG, and "their affiliates and employees," "may not, directly or indirectly, solicit or accept any business or [sic] from any sources that are introduced or made available by and through Newman without his express written consent."

55.　With respect to non-circumvention, the agreement further provides:

Parties will not in any way circumvent, or attempt to circumvent other Party, or any other parties involved in any transaction in which the parties become involved. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

56.　On October 8, 2013, after extensive fee negotiations between the parties, PCG and Newman Capital entered into an Advisory Fee Agreement (the "2013 AFA," together with the 2013 NDNCA, the "2013 Agreements").

57.　A true and correct copy of the 2013 AFA is annexed hereto as Exhibit B.

58.　Upon information and belief, PCG waited from May to October to execute an advisory fee agreement so that it could finish updating its marketing materials regarding PCG's business plan for investors.

59.　In good faith, even before the parties executed the 2013 AFA, Newman Capital shared the PCG "opportunity" to several potential investors.

60.　The 2013 AFA provides that "[f]or a period of 24 months after [October 8, 2013], [Newman Capital, defined as "Advisor"] shall have the non-exclusive right to introduce prospective Qualified Investors and Distributors to PCG" and incorporates by reference the terms of the 2013 NDNCA.

61.　The 2013 AFA also confirmed, among other things, that Newman Capital had the right to "be present at meetings and conference calls with qualified investors introduced by the Advisor" and that a breach of the 2013 NDNCA would be a "material breach" of the 2013 AFA.

11

62.    The 2013 AFA defines "Qualified Investors" as "a purchaser or purchasers of some or all of its securities, debt, project financing or other investment instruments from 'accredited investors' as defined under Rule 501 of the Securities Act of 1933…"

63.    The 2013 AFA also contains a clear and unambiguous fee structure for Newman Capital should an introduction of a Qualified Investor by Newman Capital to PCG result in an investment by said Qualified Investor.

64.    Specifically, the 2013 AFA provides:

> In the event that a Qualified Investor is accepted by PCG and the Qualified Investor subsequently closes an investment in PCG within seven (7) business days thereof, then PCG shall pay Advisor a finder's fee consisting of two components: *1) a cash finder's fee equal to 3% of the cash amount of the investment made by the Qualified Investors introduced by Advisor and 2) 1% paid out every two years on any original funds that remain in the fund (opt in for another 2 year lock up)*. This "re-up" fee is payable for a period of ten years.

65.    The 2013 AFA also provides that Newman Capital would be paid its full fee, described above, if any "person, including a Qualified Investor," who Newman Capital introduced to PCG during the term of the agreement ultimately makes an investment in PCG within five years following the expiration of the agreement (the "Tail Period").

66.    The 2013 AFA further provides that it would be "assigned" by Newman Capital "to a member firm . . . of [FINRA] prior to the closing" of a transaction contemplated by the agreement, "in accordance with the rules of FINRA."

67.    Both of the 2013 Agreements provide that New York law governs the contracts.

68.    Both of the 2013 Agreements also provide that they can be amended *only* by written agreement of the parties.

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

69.     On October 23, 2013, Newman shared with Crestline the opportunity for it to place an investment with PCG, including *via* PCG's securities, debt, project financing or other investment instruments.

70.     Representatives of Crestline appeared interested in the investment and stated that they wished to meet with PCG's management.

71.     On February 28, 2014, in Crestline's Fort Worth, Texas offices, Newman introduced PCG and Lucero to Crestline's executive team.

72.     After this meeting, Crestline expressed interest in placing a debt/credit investment with PCG in the amount of approximately $30 to 40 million.

73.     Crestline performed extensive due diligence regarding PCG over the following eight months and then signed a term sheet.

74.     Upon receipt of this Crestline term sheet, and once a copy of it was transmitted to Newman Capital, the 2013 AFA was assigned by Newman Capital to WaveCrest as contemplated in the assignment clause of the 2013 AFA.

75.     As set forth below, the 2013 AFA was later reassigned by WaveCrest to Newman Capital in 2018.

76.     Crestline ultimately closed on the first (of several) investments in December 2014 for $40 million.

### The 2014 Agreements

77.     In order to clarify that the terms of the 2013 Agreements applied to WaveCrest, on September 23, 2014, PCG and WaveCrest, entered into another Non-Disclosure and Non-Circumvention Agreement (the "2014 NDNCA") and an Engagement Agreement (the "2014 EA," together with the 2014 NDNCA, the "2014 Agreements")

13

78.    True and correct copies of the 2014 NDNCA and the 2014 EA are annexed hereto as Exhibits C and D, respectively.

79.    As with the 2013 Agreements, these 2014 Agreements were reassigned to Newman Capital in 2018.

80.    In almost all respects, the 2014 NDNCA is a mirror image of the 2013 NDNCA.

81.    With respect to the 2014 EA, the only key difference between it and the 2013 AFA is that, unlike the 2013 AFA which is deemed "non-exclusive," the 2014 EA provided WaveCrest with an "exclusive" right to introduce prospective investors to PCG for six months following the date of the agreement, followed by a non-exclusive right for the next 12 months.

82.    In all other respects, the 2014 EA mirrors the 2013 AFA, including the inclusion of the "Tail Period."

83.    Both of the 2014 Agreements provide that New York law governs the contracts.

84.    Upon information and belief, in or around April 2016 (and thus clearly within the Tail Period of the 2014 Agreements), PCG closed a round of investment with Crestline of more than $22 million in connection with the Coco Palms Resort in Kauai, Hawaii.

85.    Defendants never made Newman Capital aware of this transaction with Crestline, or any of its related contacts with Crestline after the initial meeting at Crestline in February 2014, in direct violation of both of the 2014 Agreements, which, among other things, provided Newman Capital with the rights to notice of and to be included in the negotiations of the transaction.

86.    Between the introduction to Crestline by Newman Capital on February 28, 2014 and September 2016, Defendants closed three rounds of investment funding with Crestline, for a total of $100 million: (i) December 2014 ($30 million, which later turned out to be $40 million),

14

(ii) February 2016 ($40 million, which later turned out to be $30 million), and (iii) September 2016 ($30 million).

87.    These investments were closed using WaveCrest as the "sole arranger."

88.    To date, PCG has paid only $308,995.80 – that portion of the fees owed which were due to WaveCrest.

89.    Upon information and belief, Defendants continue to breach the applicable NDNCAs, as they still regularly communicate with Crestline without Newman Capital being present, all in violation of the Agreements.

90.    As a result of these Crestline investments totaling at least $100 million, pursuant to the advisory fee agreements, Defendants owed Newman Capital fees of not less than $3 million, as of September 2016.

91.    Instead of paying these fees, however, Defendants engaged in a complex scheme to transfer both PCG's assets and the Crestline opportunities to the Known Affiliates.

92.    By way of example, as set forth in documents produced by PCG in late-September, early October 2021, in response to document requests by Newman Capital in this litigation, it is clear that PCG agreed that the Crestline investments would be made to PCG Credit Partners, a wholly-owned subsidiary of PCG Holdings, which itself was previously a wholly-owned subsidiary of PCG.

93.    Accordingly, PCG owned, as of 2016, the entities known as PCG Holdings LLC, PCG Credit Partners LLC, and any benefits of the agreements between Crestline and these entities would flow up to their corporate parent, PCG, which in turn, as alleged above, owed an obligation to Newman Capital of not less than $3 million in 2016 (currently believed to be more than $8 million).

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

94.    But in or around February 2016, PCG, for no consideration, transferred its ownership interest in PCG Holdings LLC, and thereby PCG Credit Partners LLC, to PCG Series I, which Lucero and Burke, and perhaps others, had formed on November 12, 2015.

95.    On February 1, 2016 Lucero and Burke, and perhaps others, further formed, as part of this scheme, Select Fund Management, LLC, for the purpose of receiving benefits from the Crestline funded loans which would have otherwise flowed to PCG.

96.    At the time PCG Holdings LLC, and thereby PCG Credit Partners LLC, to PCG Series I, they were valued at approximately $18 million.

97.    In furtherance of the fraudulent scheme, Burke wrote an e-mail to Lucero on May 27, 2016 which reads:

> As I was thinking more about it, we should probably not wait to get all the loan positions out of PCG and into a new holding company. Steve's lawsuit will probably be dismissed pretty quick here and Todd hasn't filed anything and probably won't until we at least try to sit down to talk to him first. That should give us a clean moment to do all of that. PCG doesn't have many assets except the loan positions on paper but wouldn't it be pretty easy for someone to do a check and find them? It might be worth Hal getting moving on getting this new entity set up and figuring out what to move and how to move it immediately.

> To which Lucero replied:

> That's fine. That stuff can just go in Stillwater or reef investments.

> . . .

> Also, this brings up the interesting quandary about putting the reserves at risk as well. I haven't really thought all the way through it, but it would be awful if someone got a judgment and we had to worry about them attaching to an account with the reserves which isn't our money.

98.    According to this plan to transfer away the last of PCG's assets, Lucero and Burke, and perhaps others, formed Reef-PCG LLC June 15, 2016 - Stillwater had previously been created on January 14, 2014 and Common Investment Fund LLC was created on September 11, 2015.

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

99. Similarly, as part of this scheme, Lucero and Burke, and perhaps others, formed Reef Capital Investment on June 10, 2016, Reef Capital Management on June 13, 2016, Reef Capital Partners on June 20, 2016. Stillwater was transferred to Reef Capital Partners, then retransferred to Reef Capital Management as of June 16, 2016.

100. Reef-PCG LLC was next transferred to Reef Capital Partners.

101. As a way of preventing Newman Capital from learning of the transfers of assets out of PCG, Lucero and Burke, and perhaps others, began operating Reef-PCG under the "d/b/a" of "PCG."

102. Initially, Reef Capital Partners was owned by Transaction Management, Inc., an entity created by Defendants in 2009, but ultimately, to further shield these assets, it was transferred to Common Investment Fund, which is owned by Lucero and Burke and perhaps others.

103. Reef Capital Investment and Reef Capital Management were created as "liability shields" for Reef Capital Partners and, ultimately Common Investment Fund.

104. When PCG's remaining assets were transferred to PCG-Reef, they were valued at approximately $25 million and included all of the fees owed to PCG for servicing the loans originated by Defendants including those funded through Crestline and others introduced by Newman Capital, but also equity positions in 160 W Canyon Crest Road LLC, 1705 Viewpoint LLC, Outlaw Country Holding LLC, Iron Fox Ballard LLC, Brookside Prairie View LLC and perhaps other assets.

105. Later, in or around February 2019, Lucero and Burke, and perhaps others, formed PCG Offshore, SFM Offshore and SFM Secured Credit II LLC, in May Lucero and Burke, and perhaps others, formed Reef Investment Management, and finally, in or around March 2020,

17

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

Lucero and Burke, and perhaps others, formed RIM Secured III, all for the purpose of receiving benefits from the investments funded by Crestline and others introduced by Newman Capital which would have otherwise flowed to PCG.

106.    Defendants formed the offshore funds after Newman Capital introduced Defendants to large capital providers in Asia, South America, Europe, UAE and Canada so that these investors would be able to invest in the types of transactions that Crestline funded.

107.    Moreover, these benefits have been further transferred out of the various entities described above using the entity initially formed by Burke: Canyon Accounting, f/k/a Burke, Shumway & Associates, LLP, a Utah limited liability partnership doing business as "Axis Advisors," which entity was later transferred to Reef Capital Management.

108.    This transfer, which was engineered by Lucero and Burke, and perhaps others, were specifically designed, as described in the e-mail exchange between Burke and Lucero above, to remove any of the expected benefits of the Crestline and other relationships introduced by Newman Capital from PCG, and thereby avoid paying Newman Capital its compensation under the Agreements.

109.    After PCG achieved more than $100 million in investments by Crestline as a result of Newman Capital's efforts and proprietary contacts, PCG has made clear that it will not honor its express agreements to compensate Newman Capital.

### The 2017 Agreements

110.    While concealing material breaches of the parties' agreements, Defendants were intent to continue using Newman Capital to obtain access to additional capital.

111.    On January 23, 2017, SFM and WaveCrest entered into a Non-Disclosure and Non-Circumvention Agreement (the "2017 NDNCA") and an Engagement Agreement (the "2017 EA," together with the 2017 NDNCA, the "2017 Agreements").

112.    True and correct copies of the 2017 Agreements are attached hereto as Exhibits E and F, respectively.

113.    The 2017 Agreements were reassigned to Newman Capital in 2018.

114.    For all intents and purposes, the 2017 NDNCA is a mirror image of the 2013 NDNCA and the 2014 NDNCA.

115.    The 2017 EA differs with the prior related agreements in three material respects. *First*, it provides Newman Capital's broker-dealer, WaveCrest (defined as "Placement Agent" in the agreement), with a non-exclusive right "to introduce to SFM prospective Qualified Investors" for a period of 24 months following the January 23, 2017. *See* Ex. J, §3. The 2017 EA, like the other agreements, also includes a "Tail Period." *See id.*

116.    *Second*, it provides a dual fee structure for Newman Capital. With respect to PCG's obligation to pay fees to Newman Capital, the 2017 EA mirrors the fee provisions in the 2013 AFA and 2014 EA:

> In the event that a Qualified Investor is accepted by SFM and the Qualified Investor subsequent closes an investment in SFM within seven (7) business days thereof, then SFM shall pay Placement Agent a finder's fee consisting of two components: 1) a cash finder's fee equal to 3% of the cash amount of the investment made by the Qualified Investors introduced by Placement Agent and 2) 1% paid out every two years on any original funds that remain in the fund (opt in for another 2 year lock up). This "re-up" fee is payable for a period of ten years.

*Id.*, §5. The 2017 EA further provides, however, that:

> If any debt including credit facilities, SPV's or factoring is placed a cash fee of two and a half percent (2.5%) on the total amount raised will be paid to the Placement Agent. In the event an investor invests in the management company

19

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

Select Fund Management LLC. SFM shall pay Placement Agent a finder's fee consisting of two components: (1) ) a cash finder's fee equal to five percent (5%) of the cash amount of the investment made by the Accredited Investors introduced by the Placement Agent and (2) a detachable warrant equal to five percent (5%) of the total number of shares or units issued to the Accredited Investors introduced by the Placement Agent with an exercisable price the same price in the offering exercisable for five years from the closing.

*Id.*

117.    *Third*, in the 2017 EA, the parties recognized that Newman Capital had already invested significant time and effort to connecting SFM with Newman Capital's business contacts, and that Newman Capital's efforts would continue.

118.    Thus, the 2017 EA, the agreement provides: "[t]he Placement Agent and SFM acknowledge that Placement Agent has already introduced SFM to prospective Qualified Investors," and also expressly listed all of the "prospective Qualified Investors" Newman Capital had introduced to PCG – 133 in total – m Schedule A to the 2017 EA.

119.    Some of these introductions are also encompassed by the "Tail Period" in the prior engagement and advisory fee agreements.

120.    Both of the 2017 Agreements provide that New York law governs the contracts.

121.    Furthermore, PCG has admitted in its own marketing materials that were published in 2018 that it "was introduced to" Crestline and that the introduction has yielded $100 million in investments.

### The 2018 Agreements

122.    On March 6, 2018, SFM and Newman Capital entered into a Non-Disclosure and Non-Circumvention Agreement (the "2018 NDNCA") and an Advisory Fee Agreement (the "2018 AFA," together with the 2018 NDNCA, the "2018 Agreements").

123.    True and correct copies of the 2018 Agreements are attached hereto as Exhibits G and H, respectively.

124.    SFM entered into the 2018 agreements with Newman Capital because Newman Capital's sole managing partner, Stephen Newman, had severed its ties with its registered broker/dealer, WaveCrest.

125.    As a result of Newman Capital's having severed ties with WaveCrest, all prior assignments to WaveCrest were re-assigned to Newman Capital.

126.    In all relevant aspects, the 2018 NDNCA is a mirror image of the 2013 NDNCA, 2014 NDNCA and 2017 NDNCA.

127.    Likewise, the 2018 AFA is a mirror image of the 2017 EA, including the "Tail Period," except for two items. *First*, the list, Schedule A, of prospective investors that Newman Capital had introduced to SFM increased to 186 parties, including 12 specific "Lending Deals" between Newman Capital's contacts and PCG.

128.    As with the 2017 EA, some of these introductions are also encompassed by the "Tail Period" in the prior engagement and advisory fee agreements.

129.    *Second*, Section 3 provided that Newman Capital is entitled to notice of "any and all communication, including but not limited to meetings, conference calls, emails, text messages or instant messages between [SFM] and Accredited Investors introduced by [Newman Capital]."

130.    Moreover, in addition to having the contractual right to be present at all such meetings, Newman Capital is entitled "to see any and all communication, including but not limited to emails, text messages or instant messages between SFM and Accredited Investors introduced by [Newman Capital],"

131.    As with the similar provisions in the other advisory fee agreements, SFM's breach of these clear rights is material.

132.    Both of the 2018 Agreements provide that New York law governs the contracts.

133.    The 2018 AFA further provides that "[a]ny legal action arising out, relating to [sic], this Agreement, and/or any amendment thereto shall be instituted in the state or federal courts sitting in the Borough of Manhattan, State of New York."

## FIRST CAUSE OF ACTION
### (Breach of Contract against PCG, SFM and the PCG Assignees)

134.    Newman Capital restates and incorporates all preceding allegations as if set forth fully herein.

135.    Newman Capital, PCG and SFM are parties to the Agreements, which are valid and enforceable as against the parties thereto.

136.    For a period of time, certain rights and responsibilities pursuant to the Agreements were assigned by Newman Capital to WaveCrest, but they were reassigned to Newman Capital by WaveCrest in 2018.

137.    PCG, SFM and their assignees, which were not divulged to Newman Capital, but which Newman Capital believes may include, but are not necessarily limited to, Reef Capital Partners, Common Interest Fund, Reef-PCG, Stillwater, Reef Capital Investment and Reef Capital Management (the "PCG Assignees"), have breached their obligations under the Agreements.

138.    Pursuant to the Agreements, Newman Capital made introductions to PCG, SFM and the PCG Assignees of approximately 186 potential investors (the "Introduced Parties").

139.    Pursuant to the Agreements, PCG, SFM and the PCG Assignees received investments from Crestline alone of more than $100 million.

140.    PCG, SFM and the PCG Assignees have repeatedly breached the Agreements by failing to pay Newman Capital the advisory fees as they came due.

141.  PCG, SFM and the PCG Assignees have repeatedly breached the Agreements by failing to advise Newman Capital of meetings they have had with the Introduced Parties or allow Newman Capital to be present for these meetings.

142.  PCG, SFM and the PCG Assignees have repeatedly breached the Agreements by failing to advise Newman Capital of the various transactions closed with the Introduced Parties, including, by way of example and not limitation, the Coco Palms Resort transaction.

143.  Newman Capital and/or WaveCrest have performed all duties and obligations owed by them under the Agreements.

144.  As a direct and proximate result of the breaches by PCG, SFM and the PCG Assignees of their obligations under the Agreements, Newman Capital has and will continue to suffer substantial damages in an amount to be determined at trial, but believed to be not less than $8 million.

### SECOND CAUSE OF ACTION
### (Intentional Interference with Contractual Relations – as Against the Known Affiliates, Lucero and Burke)

145.  Newman Capital restates and incorporates all preceding allegations as if set forth fully herein.

146.  Newman Capital, PCG and SFM were signatories to the Agreements as more fully described above.

147.  To the extent any of the Known Affiliates are determined at trial to have not been party to the Agreements addressed in the First Cause of Action, this cause of action is plead in the alternative to the First Cause of Action as to those Known Affiliates.

148.  The Known Affiliates, Lucero and Burke had full knowledge of the agreements between Newman Capital and PCG.

149.    Lucero and Burke, and perhaps others, used the Known Affiliates to enter into agreements with Crestline and other of the Introduced Parties, for the benefit of themselves, PCG, SFM and the principals of PCG, SFM, Common Investment Fund and Reef Capital Partners, as well as of the other Known Affiliates.

150.    Lucero, Burke and the Known Affiliates entered into agreements with Crestline and perhaps other Introduced Parties for purpose of circumventing the Agreements.

151.    PCG, SFM and the PCG Assignees have used the interference by Lucero, Burke and the Known Affiliates as the basis to avoid payment to Newman Capital of its contractually agreed to Advisory Fees.

152.    Lucero, Burke and the Known Affiliates, with the assistance of PCG, SFM and the PCG Assignees, employed unlawful and improper means to affect the breaches by PCG, SFM and the PCG Assignees.

153.    As a result, Newman Capital has been damaged and is entitled to an award of compensatory damages Lucero, Burke and the Known Affiliates in an amount to be determined at trial, but believed to be not less than $8 million.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment– as Against the Known Affiliates, Lucero and Burke)

154.    Newman Capital restates and incorporates all preceding allegations as if set forth fully herein.

155.    To the extent any of the Known Affiliates are determined at trial to have not been party to the Agreements addressed in the First Cause of Action, this cause of action is plead in the alternative to the First Cause of Action as to those Known Affiliates.

156.    Through the artifice of schemes including those described above, Lucero, Burke and the Known Affiliates received and obtained substantial financial gains, advantages, and

24

benefits through Newman Capital's connections and introduction of Defendants to Crestline and the other Introduced Parties without full and fair compensation to Newman Capital.

157. Newman Capital expected to be compensated as set forth in Agreements for the benefits resulting from these introductions.

158. It would be inequitable and unjust for Lucero, Burke and the Known Affiliates to retain those gains, advantages, and benefits.

159. Lucero, Burke and the Known Affiliates have benefited at the expense and to the detriment of Newman Capital.

160. Lucero, Burke and the Known Affiliates should not in equity and good conscience be permitted to retain the benefit bestowed on them by Newman Capital.

161. As a result of the retention of such benefits, Lucero, Burke and the Known Affiliates have been unjustly enriched and are jointly and severally liable to Newman Capital.

162. Accordingly, Newman Capital is entitled to an award of damages in an amount to be determined at trial, but believed to be not less than $8 million.

### FOURTH CAUSE OF ACTION
### (Fraudulent Conveyance– as Against All Defendants)

163. Newman Capital restates and incorporates all preceding allegations as if set forth fully herein.

164. Defendants PCG, Lucero and Burke, and perhaps others, formed the Known Affiliates and/or used any already existing unnamed affiliates, to transfer PCG's assets to the Known Affiliates with the specific intent to avoid paying their existing and future obligations to creditors, including Newman Capital, as they came due.

165. Alternatively, PCG, Lucero and Burke, and perhaps others, made the transfers from PCG to the Known Affiliates of PCG's without receiving reasonably equivalent value in

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

exchange for these transfers, and these transfers left PCG's remaining assets insufficient to pay its existing debts to creditors, including the amounts then due to Newman Capital, and insufficient to pay the debts PCG knew would be incurred in the future, including its obligations due to Newman Capital and other creditors.

166.    Upon information and belief, the corporate purposes and business activities of the Known Affiliates are substantially the same as PCG, and these Known Affiliates have common ownership and/or management with PCG; the transfers or obligations were made to insiders; the common ownership and/or management with PCG retained possession or control of the assets transferred after the transfers; the transfers or obligations were not disclosed, but instead were concealed; before the transfers were made or obligations were incurred, Newman Capital had complained to Lucero and Burke that PCG and SFM were in in default under the terms of the Agreements; Lucero and Burke expressly contrived to remove or conceal all of PCG's assets to avoid paying obligations owed to Newman Capital; the transfers were of substantially all the assets owned by PCG and had a value of approximately not less than $43 million; PCG received no consideration in exchange for the transfers or obligations incurred; PCG was insolvent or became insolvent as a consequence of the transfers or the obligations were incurred; and the transfers occurred shortly before or shortly after Newman Capital introduced PCG to Crestline and certain of the Introduced Parties.

167.    The transactions set forth above were fraudulent and, as set forth in the exchange between Lucero and Burke above, were made for the purpose of rendering PCG insolvent and/or left with insufficient and/or reduced capital or assets with which to carry on its business, rendering it unable to compensate Newman Capital for the amounts it was owed, and would be owed, as a consequence of the Agreements.

168.   As a result, Newman Capital has sustained losses and damages, including but not limited to lost income in an amount to be determined at trial, but believed to be not less than $8 million.

169.   Newman Capital seeks a judgment for its losses and damages, and seeks an accounting, as well as a judgment rescinding, avoiding or setting aside the fraudulent conveyances, enjoining further transfers of these assets, appointment of a receiver to take charge of the transferred assets, collect the proceeds or profits generated by these assets, or requiring the Defendants, or other transferees which are discovered during this litigation, or to pay over any proceeds received as a consequence of the transfers or obligations to the extent necessary to satisfy the Newman Capital's claim, or which allows Newman Capital to levy execution on such transferred assets or their proceeds or profits, and any such other and further relief the circumstances may require.

**WHEREFORE**, Plaintiff Newman Capital respectfully requests that this Court enter Judgment:

a.   Awarding consequential damages to Newman Capital on its claims in an amount to be determined at trial, but in no event less than $8 million;

b.   Awarding Newman Capital an accounting, as well as a judgment rescinding, avoiding or setting aside the fraudulent conveyances, enjoining further transfers of these assets, appointment of a receiver to take charge of the transferred assets, collect the proceeds or profits generated by these assets, or requiring the Defendants, or other transferees which are discovered during this litigation, or to pay over any proceeds received as a consequence of the transfers or obligations to the extent necessary to satisfy the Newman Capital's claim, or which allows Newman Capital to levy execution on such transferred assets or their proceeds or profits;

c.   Awarding punitive or exemplary damages to Newman Capital on its claims in an amount to be determined at trial;

INDEX NO. 655851/2019
RECEIVED NYSCEF: 01/06/2022

Case 1:22-cv-00663-VSB   Document 5-5   Filed 01/26/22   Page 28 of 73

d.  Awarding Newman Capital unpaid interest, including pre-judgment and post-judgment interest on any amounts determined to be owed to it;

e.  Awarding Newman Capital its reasonable attorneys' fees, interest and costs; and

f.  Granting Newman Capital such other and further relief as the Court may deem just and proper.

Dated: New York, New York
January 6, 2022

OFFIT KURMAN P.A.

BY: *Michael T. Conway*
Michael Conway
Stephen Forte
590 Madison Avenue
New York, NY 10022
Tel: (929) 476-0041
Michael.Conway@OffitKurman.com
Stephen.Forte@OffitKurman.com

*Attorneys for Plaintiff Newman Capital LLC*

28

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

This Agreement entered into as of the 30th day of May 2013, by and between Jared L. Lucero of Private Capital Group, Inc and its affiliates, associates, subsidiaries, employees, officers, directors, and assigns (collectively "Company") with its principal place of business at 160 West Canyon Crest Rd., Alpine, Utah 84004 and Newman Capital LLC ("Newman") with its principal place of business at P.O. Box 321, Short Hills, New Jersey, 07078 (Referred to individually herein as Party and collectively referred to as the Parties).

WHEREAS, Parties have certain information with respect to certain contacts, properties, development sites and proprietary business information;

WHEREAS, Parties are interested in receiving certain Confidential Information for the purpose of exploring the possibility of entering into a business association with the other Party as part of a transaction for the development or purchase of properties or the introduction by the Parties to one or more prospective business contacts;

WHEREAS, pursuant to exploring such possibilities, each of the Parties, at its sole discretion, may make available to the other Party, upon and after its execution and delivery of this Agreement, certain information and materials developed and produced by it, including, but not limited to, contact lists and information about such contacts, properties available for sale and the parties involved therewith, financial sources, oral or written information relating to specific projects, financial data, legal instruments, studies, reports of outside consultants, brochures, computer output and any other information which is proprietary in nature (collectively "Confidential Information").

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained hereinafter, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Newman and Company hereby agree as follows:

1.  This Agreement shall apply to all Confidential Information disclosed by or on behalf of both Parties, their affiliates and employees to the other Party, its affiliates and employees.

2.  Parties agrees that (i) they shall hold the Confidential Information in strict confidence and not disclose any Confidential Information to any third parties, including consultants unless consented to in writing by disclosing Party or unless the Confidential Information has become public through no effort on the part of the disclosing Party; (ii) they shall disclose the Confidential Information only to those employees of their company who need to know such information to carry out the purpose of this Agreement; (iii) they will not disclose any Confidential Information to affiliates of their company without disclosing Party's prior written consent; (iv) they will take measures necessary to safeguard the Confidential Information in order to prevent it from falling into the public domain or into possession of persons other than those authorized hereunder to have such information; (v) they will direct their principals and employees that all Confidential Information must not be disclosed to any third parties without the prior written consent of disclosing Party. Notwithstanding anything herein the contrary, any disclosing Party may disclose Confidential Information to the extent necessary to comply with any order, subpoena or other request of a court or government agency, and such disclosure shall not be considered a breach of this provision.

3.  It is understood and agreed that Parties, their affiliates and employees may not, directly or indirectly, solicit or accept any business or from any sources that are introduced or made available by and through Newman without his express written consent.

4.  Parties will not in any way circumvent, or attempt to circumvent other Party, or any other parties involved in any transaction in which the parties become involved. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

5.  Parties agree that the unauthorized disclosure or use of Confidential Information and/or circumvention by any Party will cause irreparable harm and significant injury for which monetary damages may be inadequate and/or difficult to ascertain. Accordingly, Parties agree further to that, if they fail to comply with any of their obligations as set forth herein, other Party shall have the right to seek an immediate injunction enjoining any breach of this Agreement. Parties agree further that, if they fail to comply with any of their obligations as set forth herein, the other Party shall be entitled to an accounting and repayment of all forms of compensation, commissions, fees, remunerations, attorneys fees in connection with enforcing this Agreement and benefits which Party directly or indirectly realizes as a result of or arising in connection with any such failure to comply.

6.  All copies of Confidential Information, which are in the possession of Parties, will be promptly returned to disclosing Party at any time upon disclosing Party's request.

7.  All copies of Confidential Information shall remain the sole property of disclosing Party.

8.  With the exception of the non-circumvention provision (#4), the terms of this Agreement shall commence upon the date first written above and shall continue in full force and effect as long as any of the Confidential Information continues to be maintained as confidential and proprietary by Parties and/or its affiliates.

9.  This Agreement may not be modified in any way unless in writing and signed by all of the parties hereto.

10. This Agreement shall be governed by and pursuant to the laws of the State of New York without giving effect to the conflicts of law principals thereof.

11. This Agreement may be signed in any number of counterparts, all of which shall be considered to be incorporated herein and deemed an original.

12. Company and Newman makes no representations as to the accuracy of any information provided in connection with this document or any transaction relating thereto.

13. Company and Newman makes no representations or warranty as to the accuracy or completeness of the Confidential Information.

14. Company agrees to indemnify and hold harmless Newman and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by Newman or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Company, or any of its officers, employees agents or representatives.

15. Newman agrees to indemnify and hold harmless Company and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by Company or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Newman, or any of its officers, employees agents or representatives.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Private Capital Group, Inc
By: Jared L. Lucero
Title: CEO & President
Date: 5/30/2013____

Newman Capital LLC
By: Stephen R. Newman
Title:  CEO
Date: 5/30/2013____

**ADVISORY FEE AGREEMENT**

This Advisory Fee Agreement (the "Agreement") is made as of the 8th day of October 2013 by and between Private Capital Group, Inc. (PCG) and Newman Capital LLC ("Advisor").

1. **Securities**. PCG seeks a purchaser or purchasers of some or all of its securities, debt, project financing or other investment instruments from "accredited investors" as defined under Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act") who are not already known to the PCG ("Qualified Investors"). Advisor represents to PCG that it has access to Qualified Investors and believes that it can introduce parties interested in investing in PCG.

2. **Legal Compliance**. In connection with introduction to Qualified Investors, Advisor shall comply with all applicable laws, rules and regulations, and shall specifically, but not as a limitation thereof, comply with the requirements set forth in Rule 506 of Regulation D under the Securities Act and the qualification requirements of applicable state securities laws, and shall provide all documentation to PCG reasonably necessary for PCG to timely comply with federal and state securities laws. Advisor additionally represents and warrants to PCG that Advisor is duly and validly organized and formed as a limited liability company under the laws of the state of its organization.

3. **Non-Exclusive Right** For a period of 24 months after the date hereof, Advisor shall have the non-exclusive right to introduce prospective Qualified Investors and Distributors to PCG. PCG shall confirm to Advisor that the introduction has been made in writing within 7 days of the introduction. Advisor shall have the right to be present at meetings and conference calls with qualified investors introduced by the Advisor which are subjected to the Non-Disclosure and Non-Circumvention Agreement dated as of May 30, 2013 between Advisor and PCG the terms of which are incorporated herein by this reference, and a material breach of this Agreement. This Agreement may be terminated by either party at any time upon written notice to that effect to the other party. Upon expiration or termination of this Agreement, Advisor shall provide PCG with a written list of the complete and most current contact information for all Qualified Investors with whom Advisor had discussions about PCG. Notwithstanding anything contained herein to the contrary, for a period of five years following the termination of this Agreement (the "Tail Period"), Advisor shall be paid the full fee provided for in this Agreement with respect to each person, including a Qualified Investor, introduced by Advisor to PCG during the term of this Agreement who makes any investment in PCG engages in a Change of Control Transaction (as defined in Paragraph 5) or enters into a Licensing Agreement (as defined in Paragraph 5) at any time, and from time to time, during the Tail Period.

4. **Acceptance of Investors**. The decision to accept a Qualified Investor in PCG is in the sole discretion of PCG.

5. **Fee**. In the event that a Qualified Investor is accepted by PCG and the Qualified Investor subsequently closes an investment in PCG within seven (7) business days thereof, then 

1

PCG shall pay Advisor a finder's fee consisting of two components: 1) a cash finder's fee equal to 3% of the cash amount of the investment made by the Qualified Investors introduced by the Advisor and 2) 1% paid out every two years on any original funds that remain in the fund (opt in for another 2 year lock up). This "re-up" fee is payable for a period of ten years. In the event of a transaction by PCG resulting in a change of control, directly or indirectly, of PCG including without limitation a sale of securities, a sale of all or substantially all of the assets of PCG a merger, consolidation or otherwise (a "Change of Control Transaction") to a Qualified Investor introduced by the Advisor to PCG during the term of this Agreement, then PCG shall pay Advisor a finder's fee consisting of two components: (x) a fee equal to ten percent (10%) of the dollar amount of securities purchased by the Qualified Investor introduced by the Advisor or the fair market value of a transaction with the Qualified Investor introduced by the Advisor not involving the sale of securities; plus (y) the number of shares of each class of securities (e.g. common stock, preferred stock, warrants, options) equal to ten (10%) of the total number of shares issued by or to the Qualified Investor introduced by the Advisor in the Change of Control Transaction, such shares to be issued by the same issuer and in the same class as the shares issued in the Change of Control Transaction. In the event that the Advisor introduces PCG to any person, including without limitation a Qualified Investor, who enters into a licensing or similar agreement with PCG (a "Licensing Agreement"), then PCG shall pay the Advisor an amount equal to ten percent (10%) of the revenue received by PCG under the Licensing Agreement for the full term of the Licensing Agreement, including any extensions thereof. The parties recognize that time is of the essence with respect to payment of the Advisor's fee. Each party shall bear its own costs and expenses related to the execution, delivery and performance of this Agreement and all documents contemplated hereby, except with respect to the payment of the Advisor's fee as set forth hereinabove.

6. **Indemnification**. A party hereto (an "Indemnifying Party") will indemnify and hold harmless the other party hereto and its members, managers, officers, directors, employees, agents and representatives (collectively, the "Indemnified Party") from and against any losses, claims, damages or liabilities to which the Indemnified Party may become subject, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon (a) any untrue statement of a material fact contained (i) in any offering document or any amendment or supplement thereto or (ii) in any filing, or (b) the omission to state in any offering document or any amendment or supplement thereto, or in any filing, a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission was made in reliance upon and in conformity with information furnished to the Indemnified Party by or on behalf of the Indemnifying Party specifically for use with reference to the Indemnifying Party or any person acting on its behalf or at its direction in the preparation of the offering documents in question or any such amendment or supplement thereto, or any such filing, or (c) any unauthorized use of sales materials or use of unauthorized verbal representations concerning the securities or the Indemnified Party by the Indemnifying Party, or (d) any failure to comply with this agreement or applicable laws, rules or regulations applicable to such party in connection with the sale

2

of the securities contemplated to be sold in connection herewith, including those regarding money laundering and anti-terrorist financing efforts, applicable FINRA rules, SEC rules and the USA PATRIOT Act of 2001, and will reimburse the Indemnified Party, in connection with investigation or defending such loss, claim, damage, liability or action. This indemnity agreement will be in addition to any liability that the Indemnifying Party may otherwise have.

7. **Confidentiality**. Advisor further agrees that it will maintain the confidentiality of all non-public information received by Advisor related to PCG (the "Information") in connection with the Offering and, unless and until such information shall have been made publicly available by PCG or by others without breach of a confidentiality agreement, shall disclose the Information only as authorized by PCG or as required by law or by order of a governmental authority or court of competent jurisdiction. In the event Advisor is legally required to make disclosure of any of the Information, Advisor will give notice to PCG prior to such disclosure.

8. **Miscellaneous**. This letter shall be governed by the laws of the State of New York without regard to conflict of law principles. This letter constitutes the entire understanding and agreement between the parties hereto and their respective affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). No promise, inducement, representation or agreement, other than as expressly set forth herein, has been made to or by the parties hereto. This letter may be amended only by written agreement, signed by the parties to be bound by the amendment. Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this letter. This letter shall be construed according to its fair meaning and not strictly for or against either party.

9. **Assignability**. This Agreement will be assigned by Advisor to a member firm (the "Broker/Dealer") of the Financial Industry Regulatory Authority ("FINRA") prior to the closing of the Offering or a Change of Control Transaction involving the purchase and sale of securities, in accordance with the rules of FINRA. This Agreement may be assigned by PCG with the prior written consent of Advisor or the Broker/Dealer.

10. **Benefit**. This Agreement has been and is made solely for the benefit of the parties hereto and their respective successors, permitted assigns and heirs, and no other person shall acquire or have any right under or by virtue of this Agreement.

11. **Counterparts**. This Agreement may be executed in any number of counterparts. Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first

3

above written.

**Private Capital Group Inc.**

By: _____

Name: Jared L. Lucero
Title: CEO & President
160 West Canyon Crest Road
Alpine, Utah 84004

**Newman Capital LLC**

By: _____

Name: Stephen R. Newman
Title: CEO
PO Box 321
Short Hills, NJ 07078

4

WaveCrest
Securities

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

This Agreement entered into as of the 23rd day of September 2014, by and between Private Capital Group, Inc and its affiliates, associates, subsidiaries, employees, officers, directors, and assigns (collectively "Company") with its principal place of business at 160 West Canyon Crest Rd., Alpine, Utah 84004 and WaveCrest Securities LLC ("WaveCrest") with its principal place of business at 515 Madison Avenue, 13th Floor, New York, NY 10022 (Referred to individually herein as Party and collectively referred to as the Parties).

WHEREAS, Parties have certain information with respect to certain contacts, properties, development sites and proprietary business information;

WHEREAS, Parties are interested in receiving certain Confidential Information for the purpose of exploring the possibility of entering into a business association with the other Party as part of a transaction for the development or purchase of properties or the introduction by the Parties to one or more prospective business contacts;

WHEREAS, pursuant to exploring such possibilities, each of the Parties, at its sole discretion, may make available to the other Party, upon and after its execution and delivery of this Agreement, certain information and materials developed and produced by it, including, but not limited to, contact lists and information about such contacts, properties available for sale and the parties involved therewith, financial sources, oral or written information relating to specific projects, financial data, legal instruments, studies, reports of outside consultants, brochures, computer output and any other information which is proprietary in nature (collectively "Confidential Information").

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained hereinafter, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WaveCrest and Company hereby agree as follows:

1.    This Agreement shall apply to all Confidential Information disclosed by or on behalf of both Parties, their affiliates and employees to the other Party, its affiliates and employees.

2.    Parties agrees that (i) they shall hold the Confidential Information in strict confidence and not disclose any Confidential Information to any third parties, including consultants unless consented to in writing by disclosing Party or unless the Confidential Information has become public through no effort on the part of the disclosing Party; (ii) they shall disclose the Confidential Information only to those employees of their company who need to know such information to carry out the purpose of this Agreement; (iii) they will not disclose any Confidential Information to affiliates of their company without disclosing Party's prior written consent; (iv) they will take measures necessary to safeguard the Confidential Information in order to prevent it from falling into the public domain or into possession of persons other than those authorized hereunder to have such information; (v) they will direct their principals and employees that all Confidential Information must not be



WaveCrest
Securities

disclosed to any third parties without the prior written consent of disclosing Party. Notwithstanding anything herein the contrary, any disclosing Party may disclose Confidential Information to the extent necessary to comply with any order, subpoena or other request of a court or government agency, and such disclosure shall not be considered a breach of this provision.

3.      It is understood and agreed that Parties, their affiliates and employees may not, directly or indirectly, solicit or accept any business or from any sources that are introduced or made available by and through the other Party without its express written consent.

4.      Parties will not in any way circumvent, or attempt to circumvent the disclosing Party, in any transaction originating with the disclosing Party. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

5.      Parties agree that the unauthorized disclosure or use of Confidential Information and/or circumvention by any Party will cause irreparable harm and significant injury for which monetary damages may be inadequate and/or difficult to ascertain. Accordingly, Parties agree further to that, if they fail to comply with any of their obligations as set forth herein, other Party shall have the right to seek an immediate injunction enjoining any breach of this Agreement. Parties agree further that, if they fail to comply with any of their obligations as set forth herein, the other Party shall be entitled to an accounting and repayment of all forms of compensation, commissions, fees, remunerations, attorneys fees in connection with enforcing this Agreement and benefits which Party directly or indirectly realizes as a result of or arising in connection with any such failure to comply.

6.      All copies of Confidential Information, which are in the possession of Parties, will be promptly returned to disclosing Party at any time upon disclosing Party's request.

7.      All copies of Confidential Information shall remain the sole property of disclosing Party.

8.      With the exception of the non-circumvention provision (#4), the terms of this Agreement shall commence upon the date first written above and shall continue in full force and effect as long as any of the Confidential Information continues to be maintained as confidential and proprietary by Parties and/or its affiliates.

9.      This Agreement may not be modified in any way unless in writing and signed by all of the parties hereto.

10.     This Agreement shall be governed by and pursuant to the laws of the State of New York without giving effect to the conflicts of law principals thereof.

11.     This Agreement may be signed in any number of counterparts, all of which shall be considered to be incorporated herein and deemed an original.

12.     Company and WaveCrest make no representations as to the accuracy of any information provided in connection with this document or any transaction relating thereto.

13.     Company and WaveCrest make no representations or warranty as to the accuracy or completeness of the Confidential Information.

14.     Company agrees to indemnify and hold harmless WaveCrest and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by WaveCrest or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any intentional misrepresentations, or other acts of bad faith or gross negligence by Company, or any of its officers, employees agents or representatives.

15.     WaveCrest agrees to indemnify and hold harmless Company and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by

WaveCrest
Securities

Company or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any intentional misrepresentations, or other acts of bad faith or gross negligence by WaveCrest, or any of its officers, employees agents or representatives.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Private Capital Group, Inc
By:  Jared L. Lucero
Title: CEO & President
Date: 9/23/2014

Signature:

WaveCrest Securities LLC
By:  Paul Rapello
Title:  Senior Managing Director
Date: 9/23/2014

Signature:

WaveCrest
Securities

*ENGAGEMENT AGREEMENT*

This Engagement Agreement (the "Agreement") is made as of the 23rd day of September 2014 by and between Private Capital Group, Inc. (PCG) and WaveCrest Securities LLC ("Advisor").

1. **Securities**. PCG seeks a purchaser or purchasers of some or all of its securities, debt, project financing or other investment instruments from "accredited investors" as defined under Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act") who are not already known to the PCG ("Qualified Investors"). Advisor represents to PCG that it has access to Qualified Investors and believes that it can introduce parties interested in investing in PCG.

2. **Legal Compliance**. In connection with introduction to Qualified Investors, Advisor shall comply with all applicable laws, rules and regulations, and shall specifically, but not as a limitation thereof, comply with the requirements set forth in Rule 506 of Regulation D under the Securities Act and the qualification requirements of applicable state securities laws, and shall provide all documentation to PCG reasonably necessary for PCG to timely comply with federal and state securities laws. Advisor additionally represents and warrants to PCG that Advisor is duly and validly organized and formed as a limited liability company under the laws of the state of its organization.

3. **Non-Exclusive Right** For a period of 6 months after the date hereof, Advisor shall have the exclusive right to introduce prospective Qualified Investors and Distributors to PCG. After the date hereof, Advisor shall have the non- exclusive right to introduce prospective Qualified Investors and Distributors for a period of 18 months after the date hereof. PCG shall confirm to Advisor that the introduction has been made in writing within 7 days of the introduction. Advisor shall have the right to be present at meetings and conference calls with qualified investors introduced by the Advisor which are subjected to the Non-Disclosure and Non-Circumvention Agreement dated as of September 23, 2014 between Advisor and PCG the terms of which are incorporated herein by this reference, and a material breach of this Agreement. This Agreement may be terminated by either party at any time upon written notice to that effect to the other party. Upon expiration or termination of this Agreement, Advisor shall provide PCG with a written list of the complete and most current contact information for all Qualified Investors with whom Advisor had discussions about PCG. Notwithstanding anything contained herein to the contrary, for a period of five years following the termination of this Agreement (the "Tail Period"), Advisor shall be paid the full fee provided for in this Agreement with respect to each person, including a Qualified Investor, introduced by Advisor to PCG during the term of this Agreement who makes any investment in PCG engages in a Change of Control Transaction (as defined in Paragraph 5) or enters into a Licensing

{9088A/001/01341178:1-MTP}

WaveCrest
Securities

Agreement (as defined in Paragraph 5) at any time, and from time to time, during the Tail Period.

4. **Acceptance of Investors.** The decision to accept a Qualified Investor in PCG is in the sole discretion of PCG.

5. **Fee.** In the event that a Qualified Investor is accepted by PCG and the Qualified Investor subsequently closes an investment in PCG within seven (7) business days thereof, then PCG shall pay Advisor a finder's fee consisting of two components: 1) a cash finder's fee equal to 3% of the cash amount of the investment made by the Qualified Investors introduced by the Advisor and 2) 1% paid out every two years on any original funds that remain in the fund (opt in for another 2 year lock up). This "re-up" fee is payable for a period of ten years. In the event of a transaction by PCG resulting in a change of control, directly or indirectly, of PCG including without limitation a sale of securities, a sale of all or substantially all of the assets of PCG a merger, consolidation or otherwise (a "Change of Control Transaction") to a Qualified Investor introduced by the Advisor to PCG during the term of this Agreement, then PCG shall pay Advisor a finder's fee consisting of two components: (x) a fee equal to ten percent (10%) of the dollar amount of securities purchased by the Qualified Investor introduced by the Advisor or the fair market value of a transaction with the Qualified Investor introduced by the Advisor not involving the sale of securities; plus (y) the number of shares of each class of securities (e.g. common stock, preferred stock, warrants, options) equal to ten (10%) of the total number of shares issued by or to the Qualified Investor introduced by the Advisor in the Change of Control Transaction, such shares to be issued by the same issuer and in the same class as the shares issued in the Change of Control Transaction. In the event that the Advisor introduces PCG to any person, including without limitation a Qualified Investor, who enters into a licensing or similar agreement with PCG (a "Licensing Agreement"), then PCG shall pay the Advisor an amount equal to ten percent (10%) of the revenue received by PCG under the Licensing Agreement for the full term of the Licensing Agreement, including any extensions thereof. The parties recognize that time is of the essence with respect to payment of the Advisor's fee. Each party shall bear its own costs and expenses related to the execution, delivery and performance of this Agreement and all documents contemplated hereby, except with respect to the payment of the Advisor's fee as set forth hereinabove.

6.         **Prospect Registration Process.** The Placement Agent and the Company acknowledge that an affiliate of the Placement Agent has already introduced the Transaction to potential investors set out in Schedule "A" hereto. If the Company accepts a Prospect as a potential provider of the financing then such Prospect will become an approved prospect ("Approved Prospect"). The Approved Prospect will be added to Schedule "A" and a revised Schedule "A" will be circulated for acknowledgement by the Parties.

7. **Indemnification.** A party hereto (an "Indemnifying Party") will indemnify and hold harmless the other party hereto and its members, managers, officers, directors,

WaveCrest
Securities

employees, agents and representatives (collectively, the "Indemnified Party") from and against any losses, claims, damages or liabilities to which the Indemnified Party may become subject, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon (a) any untrue statement of a material fact contained (i) in any offering document or any amendment or supplement thereto or (ii) in any filing, or (b) the omission to state in any offering document or any amendment or supplement thereto, or in any filing, a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission was made in reliance upon and in conformity with information furnished to the Indemnified Party by or on behalf of the Indemnifying Party specifically for use with reference to the Indemnifying Party or any person acting on its behalf or at its direction in the preparation of the offering documents in question or any such amendment or supplement thereto, or any such filing, or (c) any unauthorized use of sales materials or use of unauthorized verbal representations concerning the securities or the Indemnified Party by the Indemnifying Party, or (d) any failure to comply with this agreement or applicable laws, rules or regulations applicable to such party in connection with the sale of the securities contemplated to be sold in connection herewith, including those regarding money laundering and anti-terrorist financing efforts, applicable FINRA rules, SEC rules and the USA PATRIOT Act of 2001, and will reimburse the Indemnified Party, in connection with investigation or defending such loss, claim, damage, liability or action. This indemnity agreement will be in addition to any liability that the Indemnifying Party may otherwise have.

8. **Confidentiality**. Advisor further agrees that it will maintain the confidentiality of all non-public information received by Advisor related to PCG (the "Information") in connection with the Offering and, unless and until such information shall have been made publicly available by PCG or by others without breach of a confidentiality agreement, shall disclose the Information only as authorized by PCG or as required by law or by order of a governmental authority or court of competent jurisdiction. In the event Advisor is legally required to make disclosure of any of the Information, Advisor will give notice to PCG prior to such disclosure.

9. **Miscellaneous**. This letter shall be governed by the laws of the State of New York without regard to conflict of law principles. This letter constitutes the entire understanding and agreement between the parties hereto and their respective affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). No promise, inducement, representation or agreement, other than as expressly set forth herein, has been made to or by the parties hereto. This letter may be amended only by written agreement, signed by the parties to be bound by the amendment. Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this letter. This letter shall be construed according to its fair meaning and not strictly for or against either party.

WaveCrest
Securities

10. **Benefit**. This Agreement has been and is made solely for the benefit of the parties hereto and their respective successors, permitted assigns and heirs, and no other person shall acquire or have any right under or by virtue of this Agreement.

11. **Counterparts**. This Agreement may be executed in any number of counterparts. Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Private Capital Group Inc.**

By:

Name: Jared L. Lucero
Title: CEO & President
160 West Canyon Crest Road
Alpine, Utah 84004

**WaveCrest Securities LLC**

By:

Name: Paul Rapello
Title: Senior Managing Director
515 Madison Avenue, 13th Floor
New York, NY 10022

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

This Agreement entered into as of the 9th day of January 2017, by and between Select Fund Management LLC and its affiliates with respect to capital providers that are introduced to the Company (defined below) by WaveCrest Securities LLC ("WaveCrest") (collectively, "Affiliates") , associates, subsidiaries, employees, officers, directors, and assigns (collectively, "Select Fund" or the "Company"), with its principal place of business at 160 West Canyon Crest Rd., Alpine, Utah 84004 and WaveCrest , with its principal place of business at 830 Third Avenue, 5th Floor, New York, NY 10022 WaveCrest and Select Fund each referred to individually herein as a "Party," and collectively referred to as the "Parties").

WHEREAS, Parties have certain information with respect to certain contacts, properties, development sites and proprietary business information;

WHEREAS, Parties are interested in receiving certain Confidential Information for the purpose of exploring the possibility of entering into a business association with the other Party as part of a transaction for the development or purchase of properties or the introduction by the Parties to one or more prospective business contacts;

WHEREAS, pursuant to exploring such possibilities, each of the Parties, at its sole discretion, may make available to the other Party, upon and after its execution and delivery of this Agreement, certain information and materials developed and produced by it, including, but not limited to, contact lists and information about such contacts, properties available for sale and the parties involved therewith, financial sources, oral or written information relating to specific projects, financial data, legal instruments, studies, reports of outside consultants, brochures, computer output and any other information which is proprietary in nature (collectively "Confidential Information").

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained hereinafter, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WaveCrest and Company hereby agree as follows:

1.  This Agreement shall apply to all Confidential Information disclosed by or on behalf of both Parties, their affiliates and employees to the other Party, its affiliates and employees.

2.  Parties agree that (i) they shall hold the Confidential Information in strict confidence and not disclose any Confidential Information to any third parties, including consultants unless consented to in writing by disclosing Party or unless the Confidential Information has become public through no effort on the part of the disclosing Party; (ii) they shall disclose the Confidential Information only to those employees of their company who need to know such information to carry out the purpose of this Agreement; (iii) they will not disclose any Confidential Information to affiliates of their company without disclosing Party's prior written consent; (iv) they will take measures necessary to safeguard the Confidential Information in order to prevent it from falling into the public domain or into possession of persons other than those authorized hereunder to have such

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

information; (v) they will direct their principals and employees that all Confidential Information must not be disclosed to any third parties without the prior written consent of disclosing Party. Notwithstanding anything herein the contrary, any disclosing Party may disclose Confidential Information to the extent necessary to comply with any order, subpoena or other request of a court or government agency, and such disclosure shall not be considered a breach of this provision.

3.  It is understood and agreed that the Company, its Affiliates and employees may not, directly or indirectly, solicit or accept any business or from any sources that are introduced or made available by and through WaveCrest without its express written consent.

4.  Parties will not in any way circumvent, or attempt to circumvent the other Party, or any other parties involved in any transaction in which WaveCrest introduced to the Company capital providers. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

5.  Parties agree that the unauthorized disclosure or use of Confidential Information and/or circumvention by any Party will cause irreparable harm and significant injury for which monetary damages may be inadequate and/or difficult to ascertain. Accordingly, Parties agree further to that, if they fail to comply with any of their obligations as set forth herein, other Party shall have the right to seek an immediate injunction enjoining any breach of this Agreement. Parties agree further that, if they fail to comply with any of their obligations as set forth herein, the other Party shall be entitled to an accounting and repayment of all forms of compensation, commissions, fees, remunerations, attorneys fees in connection with enforcing this Agreement and benefits which Party directly or indirectly realizes as a result of or arising in connection with any such failure to comply.

6.  All copies of Confidential Information, which are in the possession of Parties, will be promptly returned to disclosing Party at any time upon disclosing Party's request.

7.  All copies of Confidential Information shall remain the sole property of disclosing Party.

8.  With the exception of the non-circumvention provision (#4), the terms of this Agreement shall commence upon the date first written above and shall continue in full force and effect as long as any of the Confidential Information continues to be maintained as confidential and proprietary by Parties and/or its affiliates.

9.  This Agreement may not be modified in any way unless in writing and signed by all of the parties hereto.

10. This Agreement shall be governed by and pursuant to the laws of the State of New York without giving effect to the conflicts of law principals thereof.

11. This Agreement may be signed in any number of counterparts, all of which shall be considered to be incorporated herein and deemed an original.

12. Company and WaveCrest makes no representations as to the accuracy of any information provided in connection with this document or any transaction relating thereto.

# WAVECREST SECURITIES

13. Company and WaveCrest makes no representations or warranty as to the accuracy or completeness of the Confidential Information.

14. Company agrees to indemnify and hold harmless WaveCrest and its advisors, professionals,affiliates, partners, agents and employees and each other person, if any, controlled by WaveCrest or any of its affiliates to the fullest extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Company, or any of its officers, employees agents or representatives.

15. WaveCrest agrees to indemnify and hold harmless Company and its advisors, professionals, Affiliates, partners, agents and employees and each other person, if any, controlled by Company or any of its Affiliates to the fullest extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by WaveCrest, or any of its officers, employees agents or representatives.

[Signature Page Follow]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Select Fund Management LLC
By: Michael Burke
Title: President
Date: 1/23/2017

WaveCrest Securities LLC
By: Paul Rapello
Title: Senior Managing Director
Date: 1/23/2017

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

## *ENGAGEMENT AGREEMENT*

This Engagement Agreement (the "Agreement") is made as of the 23rd day of January 2017 by and between Select Fund Management LLC ("SFM") and WaveCrest Securities LLC ("Placement Agent").

1. **Securities**. SFM seeks a purchaser or purchasers of some or all of its securities, debt, project financing or other investment instruments from "accredited investors" as defined under Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), including, but not limited to, all parties listed on Schedule A attached hereto and all other parties that are introduced to SFM by Placement Agent (collectively, "Qualified Investors"). Placement Agent represents to SFM that it has access to Qualified Investors and believes that it can introduce parties interested in investing in SFM.

2. **Legal Compliance**. In connection with its introduction to Qualified Investors, Placement Agent shall comply with all applicable laws, rules and regulations, and shall specifically, but not as a limitation thereof, comply with the requirements set forth in Rule 506 of Regulation D under the Securities Act and the qualification requirements of applicable state securities laws, and shall provide all documentation to SFM reasonably necessary for SFM to timely comply with federal and state securities laws. Placement Agent additionally represents and warrants to SFM that Placement Agent is duly and validly organized and formed as a limited liability company under the laws of the state of its organization.

3. **Non-Exclusive Right** For a period of twenty-four (24) months after the date hereof, Placement Agent shall have the non-exclusive right to introduce to SFM prospective Qualified Investors . Placement Agent shall have the right to be present at meetings and conference calls with Qualified Investors introduced by the Placement Agent, which are subject to the Non-Disclosure and Non-Circumvention Agreement, dated as of January 23 2017, by and between Placement Agent and SFM (the "NCNDA"), the terms of which are incorporated herein by reference, and the breach of such NCNDA shall constitute a material breach of this Agreement. This Agreement may be terminated by either party to this Agreement at any time upon written notice to that effect to the other party. Upon expiration or termination of this Agreement, Placement Agent shall provide SFM with a written list of the complete and most current contact information for all Qualified Investors with whom Placement Agent had discussions about SFM. Notwithstanding anything contained herein to the contrary, for a period of five years following the termination of this Agreement (the "Tail Period"), Placement Agent shall be paid by SFM the full fee provided for in this Agreement with respect to each person or entity, including a Qualified Investor, introduced by

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

Placement Agent to SFM during the term of this Agreement who makes any investment in SFM or engages in a Change of Control Transaction (as defined in Paragraph 5) or enters into a Licensing Agreement (as defined in Paragraph 5) at any time, and from time to time, during the Tail Period.

4. **Acceptance of Investors**. The decision to accept a Qualified Investor in SFM is in the sole discretion of SFM.

5. **Fee**. In the event that a Qualified Investor is accepted by SFM and the Qualified Investor subsequently closes an investment in SFM within seven (7) business days thereof, then SFM shall pay Placement Agent a finder's fee consisting of two components: 1) a cash finder's fee equal to 3% of the cash amount of the investment made by the Qualified Investors introduced by the Placement Agent and 2) 1% paid out every two years on any original funds that remain in the fund (opt in for another 2 year lock up). This "re-up" fee is payable for a period of ten years. If any debt including credit facilities, SPV's or factoring is placed a cash fee of two and a half percent (2.5%) on the total amount raised will be paid to the Placement Agent. In the event an investor invests in the management company Select Fund Management LLC, SFM shall pay Placement Agent a finder's fee consisting of two components: (1) ) a cash finder's fee equal to five percent (5%) of the cash amount of the investment made by the Accredited Investors introduced by the Placement Agent and (2) a detachable warrant equal to five percent (5%) of the total number of shares or units issued to the Accredited Investors introduced by the Placement Agent with an exercise price the same price per share in the offering exercisable for five years from the closing. In the event of a transaction by SFM resulting in a change of control, directly or indirectly, of SFM including without limitation a sale of securities, a sale of all or substantially all of the assets of SFM a merger, consolidation or otherwise (a "Change of Control Transaction") to a Qualified Investor introduced by the Placement Agent to SFM during the term of this Agreement, then SFM shall pay Placement Agent a finder's fee consisting of two components: (x) a fee equal to five percent (5%) of the dollar amount of securities purchased by the Qualified Investor introduced by the Placement Agent; plus (y) the number of shares of each class of securities (e.g. common stock, preferred stock, warrants, options) equal to five (5%) of the total number of shares issued by or to the Qualified Investor introduced by the Placement Agent in the Change of Control Transaction, such shares to be issued by the same issuer and in the same class as the shares issued in the Change of Control Transaction. In the event that the Placement Agent introduces SFM to any person, including without limitation a Qualified Investor, who enters into a licensing or similar agreement with SFM (a "Licensing Agreement"), then SFM shall pay the Placement Agent an amount equal to ten percent (10%) of the revenue received by SFM under the Licensing Agreement for the full term of the Licensing Agreement, including any extensions thereof. The parties recognize that time is of the essence with respect to payment of the Placement Agent's fee. Each party shall bear its own costs and expenses related to the execution, delivery and performance of this Agreement and all documents contemplated hereby, except with respect to the payment of the Placement Agent's fee as set forth hereinabove.

**WAVECREST** SECURITIES

6.          **Prospect Registration Process.** The Placement Agent and SFM acknowledge
that Placement Agent has already introduced SFM to prospective Qualified Investors set forth in
                    Schedule "A" attached hereto. To the extent that any new prospective
Qualified Investors are shown the opportunity to invest in SFM by the Placement Agent, such
Qualified Investors  shall be subject to the terms of this Agreement and be added to the list set
forth in                    Schedule "A" attached hereto.

7. **Indemnification.** A party hereto (an "Indemnifying Party") will indemnify and hold
harmless the other party hereto and its members, managers, officers, directors,
employees, agents and representatives (collectively, the "Indemnified Party") from
and against any losses, claims, damages or liabilities to which the Indemnified Party
may become subject, under the Securities Act or otherwise, insofar as such losses,
claims, damages or liabilities (or actions in respect thereof) arise out of or are based
upon (a) any untrue statement of a material fact contained (i) in any offering
document or any amendment or supplement thereto or (ii) in any filing, or (b) the
omission to state in any offering document or any amendment or supplement thereto,
or in any filing, a material fact required to be stated therein or necessary to make the
statements therein not misleading, in each case to the extent, but only to the extent,
that such untrue statement or omission was made in reliance upon and in conformity
with information furnished to the Indemnified Party by or on behalf of the
Indemnifying Party specifically for use with reference to the Indemnifying Party or
any person acting on its behalf or at its direction in the preparation of the offering
documents in question or any such amendment or supplement thereto, or any such
filing, or (c) any unauthorized use of sales materials or use of unauthorized verbal
representations concerning the securities or the Indemnified Party by the
Indemnifying Party, or (d) any failure to comply with this agreement or applicable
laws, rules or regulations applicable to such party in connection with the sale of the
securities contemplated to be sold in connection herewith, including those regarding
money laundering and anti-terrorist financing efforts, applicable FINRA rules, SEC
rules and the USA PATRIOT Act of 2001, and will reimburse the Indemnified Party,
in connection with investigation or defending such loss, claim, damage, liability or
action. This indemnity agreement will be in addition to any liability that the
Indemnifying Party may otherwise have.

8. **Confidentiality.** Subject to the NCNDA,Placement Agent agrees that it will maintain
the confidentiality of all non-public information received by Placement Agent related
to SFM (the "Information") in connection with the offering, and, unless and until
such information shall have been made publicly available by SFM or by others
without breach of the NCNDA or other applicable confidentiality agreement, shall
disclose the Information only as authorized by SFM or as required by law or by order
of a governmental authority or court of competent jurisdiction.   In the event
Placement Agent is legally required to make disclosure of any of the Information,
Placement Agent will give notice to SFM prior to such disclosure.

9. **Miscellaneous.**  This Agreement shall be governed by the laws of the State of New

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

York without regard to conflict of law principles. This Agreement constitutes the entire understanding and agreement between the parties hereto and their respective affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). No promise, inducement, representation or agreement, other than as expressly set forth herein, has been made to or by the parties hereto. This Agreement may be amended only by written agreement, signed by the parties to be bound by the amendment. Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this Agreement. This Agreement shall be construed according to its fair meaning and not strictly for or against either party.

10. **Benefit**. This Agreement has been and is made solely for the benefit of the parties hereto and their respective successors, permitted assigns and heirs, and no other person shall acquire or have any right under or by virtue of this Agreement.

11. **Counterparts**. This Agreement may be executed in any number of counterparts. Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**Select Fund Management LLC**

By:

Name: Michael Burke
Title: President
160 West Canyon Crest Road
Alpine, Utah 84004

**WaveCrest Securities LLC**

By:

Name: Paul Rapello
Title: Senior Managing Director

{9088A/001/01341178:1-MTP}

# WAVECREST SECURITIES

830 Third Avenue, 5th Floor
New York, NY 10022

{9088A/001/01341178:1-MTP}

# WAVECREST SECURITIES

## Schedule "A"

Qualified Investors Introduced to Select Fund Management LLC By WaveCrest Securities LLC

Aberdeen Asset Management
AIG
Altura Capital
Appaloosa Management
Arden Asset Management
Art Capital Group
Atalaya Capital Management
B2R Financial
Baker Currie
Barrett Family
Berens Capital
Bessemer Trust
Blackrock
Blackstone Partners
Boelte Family
Bollinger Enterprises
BondiT Group
Bostwick Capital
Cantor Fitzgerald
Carlson Capital
Castlelake LP
Cerberus Capital Management (Dymas Lending)
Cline Family
CPEX Real Estate
CIFC
CITC Capital Holdings (China)
Coatue Management
Cohen Family
Colony Capital
Colmont Capital (Salandra Family Office)
Comvest Partners
Cravens Brothers
Crestline Investors(Bass Family Office)
Cross Park Family Office
Crow Holdings
Crystal Family
Crystal Financial
Cutwater
Czech Asset Management

{9088A/001/01341178:1-MTP}

# WAVECREST SECURITIES

Davidson Kempner
Dorest Road Partners (Paul Murdock)
East Bridge Real Estate
Eagle Reality Group
Ellington Management group
EOS Capital
Fallbrook Credit
Family Office Association
Family Office Club
Fidelity Investments
Fisher Brothers
Fleck Family
Fortress
Fort Washington/Western & Southern
Fowler Property Acquisition SanFran
Goff Capital Partners
Goldman Sachs Asset Management
Goldman Sachs Specialty Lending Group
Golub Capital
GreenOak Real Estate LP
GSO Capital Partners
GWM Advisors
Hawks Family
Heaton Companies
Holdun Investment Partners
Holowesko Partners
Indigo Asset Management
Innovatus Capital
Jasper Ridge Partners
Jerri Moore Family Office
Kinghorn Holdings LLC- Jose Sanchez
L Investments
LCN Capital Partners
Lexington Partners
Lido Advisors
Lyxor Asset Management
Madison Partners
Mariner Investment Group
Matrix Capital Group
Medley Management
MetLife
Michaud Capital Management
Midmark Capital
MPK Equity Partners (Perot Family Office)
Newhall Family

{9088A/001/01341178:1-MTP}

# WAVECREST SECURITIES

Paamco
Paragon Outcomes
PeerStreet
Perella Weinberg Partners
Peter Kellogg Family Office
Point72 Asset Management
Property Group Partners – Jeffrey Sussman
Prudential Insurance
Ramius Asset Management
Raven Capital Management
RedBird Capital
Redwood Capital (Davis Family)
Related Companies
Richard B duBusc
Ryan Family
Olympia Capital Management
SAC Capital
Sasco Capital
Sierentz Energy (Louis Dreyfus Family Office)
Siguler Gulf
Singerland Family
Silverpeak Real Estate Partners
Soros
Sound Harbour Partners
Southern Capital Trust (Chile)
Stabilis Capital
Stamos Capital
Starwood Capital
Stephens Group
Taconic Capital
THL Credit (Thomas Lee)
Three Ocean Partners
Tenco Holdings
Tiedemann Wealth Management
Tiger Lily Capital (Manning Family Office)
Titan Advisors
Titan Capital ID
TowerBrook Capital
Tower Insurance
TPG Specialty Lending
Triage Funds
Trust Company West (TCW)
Two Sigma
University of Mississippi Endowment
USA Capital

# WAVECREST SECURITIES

Victory Park Capital
Visium Asset Management
Watts Capital
Wilmington Trust

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

23 (AL)

This Agreement entered into as of the 9th day of January 2017, by and between Select Fund Management LLC and its affiliates with respect to capital providers that are introduced to the Company (defined below) by WaveCrest Securities LLC ("WaveCrest") (collectively, "Affiliates") , associates, subsidiaries, employees, officers, directors, and assigns (collectively, "Select Fund" or the "Company"), with its principal place of business at 160 West Canyon Crest Rd., Alpine, Utah 84004 and WaveCrest , with its principal place of business at 830 Third Avenue, 5th Floor, New York, NY 10022 WaveCrest and Select Fund each referred to individually herein as a "Party," and collectively referred to as the "Parties").

WHEREAS, Parties have certain information with respect to certain contacts, properties, development sites and proprietary business information;

WHEREAS, Parties are interested in receiving certain Confidential Information for the purpose of exploring the possibility of entering into a business association with the other Party as part of a transaction for the development or purchase of properties or the introduction by the Parties to one or more prospective business contacts;

WHEREAS, pursuant to exploring such possibilities, each of the Parties, at its sole discretion, may make available to the other Party, upon and after its execution and delivery of this Agreement, certain information and materials developed and produced by it, including, but not limited to, contact lists and information about such contacts, properties available for sale and the parties involved therewith, financial sources, oral or written information relating to specific projects, financial data, legal instruments, studies, reports of outside consultants, brochures, computer output and any other information which is proprietary in nature (collectively "Confidential Information").

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained hereinafter, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, WaveCrest and Company hereby agree as follows:

1.  This Agreement shall apply to all Confidential Information disclosed by or on behalf of both Parties, their affiliates and employees to the other Party, its affiliates and employees.

2.  Parties agree that (i) they shall hold the Confidential Information in strict confidence and not disclose any Confidential Information to any third parties, including consultants unless consented to in writing by disclosing Party or unless the Confidential Information has become public through no effort on the part of the disclosing Party; (ii) they shall disclose the Confidential Information only to those employees of their company who need to know such information to carry out the purpose of this Agreement; (iii) they will not disclose any Confidential Information to affiliates of their company without disclosing Party's prior written consent; (iv) they will take measures necessary to safeguard the Confidential Information in order to prevent it from falling into the public domain or into possession of persons other than those authorized hereunder to have such

{9088A/001/01341178:1-MTP}

**WAVECREST** SECURITIES

information; (v) they will direct their principals and employees that all Confidential Information must not be disclosed to any third parties without the prior written consent of disclosing Party. Notwithstanding anything herein the contrary, any disclosing Party may disclose Confidential Information to the extent necessary to comply with any order, subpoena or other request of a court or government agency, and such disclosure shall not be considered a breach of this provision.

3.  It is understood and agreed that the Company, its Affiliates and employees may not, directly or indirectly, solicit or accept any business or from any sources that are introduced or made available by and through WaveCrest without its express written consent.

4.  Parties will not in any way circumvent, or attempt to circumvent the other Party, or any other parties involved in any transaction in which WaveCrest introduced to the Company capital providers. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

5.  Parties agree that the unauthorized disclosure or use of Confidential Information and/or circumvention by any Party will cause irreparable harm and significant injury for which monetary damages may be inadequate and/or difficult to ascertain. Accordingly, Parties agree further to that, if they fail to comply with any of their obligations as set forth herein, other Party shall have the right to seek an immediate injunction enjoining any breach of this Agreement. Parties agree further that, if they fail to comply with any of their obligations as set forth herein, the other Party shall be entitled to an accounting and repayment of all forms of compensation, commissions, fees, remunerations, attorneys fees in connection with enforcing this Agreement and benefits which Party directly or indirectly realizes as a result of or arising in connection with any such failure to comply.

6.  All copies of Confidential Information, which are in the possession of Parties, will be promptly returned to disclosing Party at any time upon disclosing Party's request.

7.  All copies of Confidential Information shall remain the sole property of disclosing Party.

8.  With the exception of the non-circumvention provision (#4), the terms of this Agreement shall commence upon the date first written above and shall continue in full force and effect as long as any of the Confidential Information continues to be maintained as confidential and proprietary by Parties and/or its affiliates.

9.  This Agreement may not be modified in any way unless in writing and signed by all of the parties hereto.

10. This Agreement shall be governed by and pursuant to the laws of the State of New York without giving effect to the conflicts of law principals thereof.

11. This Agreement may be signed in any number of counterparts, all of which shall be considered to be incorporated herein and deemed an original.

12. Company and WaveCrest makes no representations as to the accuracy of any information provided in connection with this document or any transaction relating thereto.

# WAVECREST SECURITIES

13.     Company and WaveCrest makes no representations or warranty as to the accuracy or completeness of the Confidential Information.

14.     Company agrees to indemnify and hold harmless WaveCrest and its advisors, professionals,affiliates, partners, agents and employees and each other person, if any, controlled by WaveCrest or any of its affiliates to the fullest extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Company, or any of its officers, employees agents or representatives.

15.     WaveCrest agrees to indemnify and hold harmless Company and its advisors, professionals, Affiliates, partners, agents and employees and each other person, if any, controlled by Company or any of its Affiliates to the fullest extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by WaveCrest, or any of its officers, employees agents or representatives.

[Signature Page Follow]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Select Fund Management LLC
By:  Michael Burke
Title: President
Date: 1/23/2017

WaveCrest Securities LLC
By:  Paul Rapello
Title:  Senior Managing Director
Date: 1/23/2017

{9088A/001/01341178:1-MTP}

**NCL**

Newman Capital LLC

## NON-DISCLOSURE AND NON-CIRCUMVENTION AGREEMENT

This Agreement entered into as of the 6th day of March 2018, by and between Select Fund Management LLC and its affiliates with respect to capital providers that are introduced to the Company (defined below) by Newman Capital LLC ("Newman") (collectively "Affiliates") , associates, subsidiaries, employees, officers, directors, and assigns (collectively, "Select Fund" or the "Company") with its principal place of business at 160 West Canyon Road, Alpine, Utah 84004 and Newman Capital LLC ("Newman") with its principal place of business at PO Box 321, Short Hills, New Jersey, 07078 Newman and Select Fund each referred to individually herein as a "Party", and collectively referred to as the Parties

WHEREAS, Parties have certain information with respect to certain contacts, properties, development sites and proprietary business information;

WHEREAS, Parties are interested in receiving certain Confidential Information for the purpose of exploring the possibility of entering into a business association with the other Party as part of a transaction for the development or purchase of properties or the introduction by the Parties to one or more prospective business contacts;

WHEREAS, pursuant to exploring such possibilities, each of the Parties, at its sole discretion, may make available to the other Party, upon and after its execution and delivery of this Agreement, certain information and materials developed and produced by it, including, but not limited to, contact lists and information about such contacts, properties available for sale and the parties involved therewith, financial sources, oral or written information relating to specific projects, financial data, legal instruments, studies, reports of outside consultants, brochures, computer output and any other information which is proprietary in nature (collectively "Confidential Information").

NOW, THEREFORE, in consideration of the representations, warranties and covenants contained hereinafter, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Newman and Company hereby agree as follows.

1      This Agreement shall apply to all Confidential Information disclosed by or on behalf of both Parties, their affiliates and employees to the other Party, its affiliates and employees

2.     Parties agrees that (i) they shall hold the Confidential Information in strict confidence and not disclose any Confidential Information to any third parties, including consultants unless consented to in writing by disclosing Party or unless the Confidential Information has

**NCL**

Newman Capital LLC

become public through no effort on the part of the disclosing Party; (ii) they shall disclose the Confidential Information only to those employees of their company who need to know such information to carry out the purpose of this Agreement; (iii) they will not disclose any Confidential Information to affiliates of their company without disclosing Party's prior written consent; (iv) they will take measures necessary to safeguard the Confidential Information in order to prevent it from falling into the public domain or into possession of persons other than those authorized hereunder to have such information; (v) they will direct their principals and employees that all Confidential Information must not be disclosed to any third parties without the prior written consent of disclosing Party. Notwithstanding anything herein the contrary, any disclosing Party may disclose Confidential Information to the extent necessary to comply with any order, subpoena or other request of a court or government agency, and such disclosure shall not be considered a breach of this provision.

3. It is understood and agreed that Parties, their affiliates and employees may not, directly or indirectly, solicit or accept any business or from any sources that are introduced or made available by and through Newman without his express written consent.

4. Parties will not in any way circumvent, or attempt to circumvent other Party, or any other parties involved in any transaction in which the Advisor Newman introduced to the Company capital providers. It is further agreed that Parties recognize any contacts or sources to be exclusive and valuable contacts of originating Party and that Parties will not enter into any direct or indirect offers, negotiations and or transactions with such contacts revealed by other Party.

5. Parties agree that the unauthorized disclosure or use of Confidential Information and/or circumvention by any Party will cause irreparable harm and significant injury for which monetary damages may be inadequate and/or difficult to ascertain. Accordingly, Parties agree further to that, if they fail to comply with any of their obligations as set forth herein, other Party shall have the right to seek an immediate injunction enjoining any breach of this Agreement. Parties agree further that, if they fail to comply with any of their obligations as set forth herein, the other Party shall be entitled to an accounting and repayment of all forms of compensation, commissions, fees, remunerations, attorneys fees in connection with enforcing this Agreement and benefits which Party directly or indirectly realizes as a result of or arising in connection with any such failure to comply.

6. All copies of Confidential Information, which are in the possession of Parties, will be promptly returned to disclosing Party at any time upon disclosing Party's request.

7. All copies of Confidential Information shall remain the sole property of disclosing Party.

8. With the exception of the non-circumvention provision (#4), the terms of this Agreement shall commence upon the date first written above and shall continue in full force and effect as long as any of the Confidential Information continues to be maintained as confidential and proprietary by Parties and/or its affiliates

9. This Agreement may not be modified in any way unless in writing and signed by all of the parties hereto.

10. This Agreement shall be governed by and pursuant to the laws of the State of New York without giving effect to the conflicts of law principals thereof.

11. This Agreement may be signed in any number of counterparts, all of which shall be considered to be incorporated herein and deemed an original.

12. Company and Newman makes no representations as to the accuracy of any information provided in connection with this document or any transaction relating thereto.

13. Company and Newman makes no representations or warranty as to the accuracy or completeness of the Confidential Information.

**NCL**

Newman Capital LLC

14. Company agrees to indemnify and hold harmless Newman and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by Newman or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Company, or any of its officers, employees agents or representatives.

15. Newman agrees to indemnify and hold harmless Company and its advisors, professionals and affiliates, partners, agents and employees and each other person, if any, controlled by Company or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorney's fees and disbursements) that result from any misrepresentations, or other acts of bad faith or gross negligence by Newman, or any of its officers, employees agents or representatives.

[Signature Page Follows]

WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first written above.

Select Fund Management LLC

By: Michael Burke

Title: President

Date: 3/6/2018

Newman Capital LLC

By: Stephen R. Newman

Title: CEO

Date: 3/6/2018

**NCL**

Newman Capital LLC

## ADVISORY FEE AGREEMENT

This Advisory Fee Agreement (the "Agreement") is made as of the 6th day of March 2018 by and between Select Fund Management LLC ("SFM") and Newman Capital LLC ("Advisor").

1. **Securities**. SFM seeks a purchaser or purchasers of some or all of its securities, debt, project financing, credit facilities or other investment instruments from "Accredited Investors" as defined under Rule 501(a) of the Securities Act of 1933, as amended (the "Securities Act"), including but not limited to all parties listed on Schedule A attached hereto or all other parties that are introduced to SFM by Advisor (collectively "Accredited Investors"). Advisor represents to SFM that it has access to Accredited Investors and believes that it can introduce parties interested in investing in SFM.

2. **Legal Compliance**. In connection with introduction to Accredited Investors, Advisor shall comply with all applicable laws, rules and regulations, and shall specifically, but not as a limitation thereof, comply with the requirements set forth in Rule 506 of Regulation D under the Securities Act and the qualification requirements of applicable state securities laws, and shall provide all documentation to SFM reasonably necessary for SFM to timely comply with federal and state securities laws. Advisor additionally represents and warrants to SFM that Advisor is duly and validly organized and formed as a limited liability company under the laws of the state of its organization.

3. **Non-Exclusive Right** For a period of 24 months after the date hereof, Advisor shall have the non-exclusive right to introduce prospective Accredited Investors. SFM will notify Advisor of any and all communication, including but not limited to meetings, conference calls, emails, text messages or instant messages between them and Accredited Investors introduced by Advisor. Advisor shall have the right to be present at any or all meetings and conference calls and to see any and all communication, including but not limited to emails, text messages or instant messages between SFM and the Accredited Investors introduced by the Advisor. Any failure by SFM to provide such notifications and/or to allow Advisor to be present at any or all meetings or conference calls shall constitute a material breach of this Agreement by SFM and be deemed a circumvention of that certain Non-Disclosure and Non-Circumvention Agreement dated as of March 6th, 2018 between Advisor and SFM the terms of which are incorporated herein by this reference, and a material breach of this Agreement. This Agreement may be terminated by either party at any time upon written notice to that effect to the other party. Upon expiration or termination of this Agreement, Advisor shall provide SFM with a written list of the complete and most current contact information for all Accredited Investors with whom Advisor had discussions about SFM Notwithstanding anything contained herein to the contrary, for a period of five years following the termination of this Agreement (the "Tail Period"), Advisor shall be paid the full fee provided for in this Agreement with respect to each person, including a Accredited Investor, introduced by Advisor to SFM during the term of this Agreement who makes any investment in SFM engages in a Change of Control Transaction (as defined in Paragraph 5) or enters into a Licensing Agreement (as

**NCL**

Newman Capital LLC

defined in Paragraph 5) at any time, and from time to time, during the Tail Period.

4. **Acceptance of Investors**. The decision to accept a Accredited Investor in SFM is in the sole discretion of SFM

5. **Fee**. In the event that a Accredited Investor is accepted by SFM and the Accredited Investor subsequently closes an investment in SFM within five (5) business days thereof, then SFM shall pay Advisor a finder's fee consisting of two components: (1) a cash finder's fee equal to three percent (3%) of the cash amount of the investment made by the Accredited Investors introduced by the Advisor and (2) 1% paid out every two years on any orginal funds that remain in the fund (opt in for another 2 year lock up). This "re-up" fee is payable for a period of ten years. If any debt including credit facilities, SPV's or factoring is placed a cash fee of two and a half percent (2.5%) on the total amount raised will be paid to the Advisor. In the event an investor invests in the management company Select Fund Management LLC, SFM shall pay Advisor a finder's fee consisting of two components: (1) ) a cash finder's fee equal to five percent (5%) of the cash amount of the investment made by the Accredited Investors introduced by the Advisor and (2) a detachable warrant equal to five percent (5%) of the total number of shares or units issued to the Accredited Investors introduced by the Advisor with an exercise price the same price per share in the offering exercisable for five years from the closing. In the event of a transaction by SFM resulting in a change of control, directly or indirectly, of SFM including without limitation a sale of securities, a sale of all or substantially all of the assets of SFM a merger, consolidation or otherwise (a "Change of Control Transaction") to a Accredited Investor introduced by the Advisor to SFM during the term of this Agreement, then SFM shall pay Advisor a finder's fee consisting of two components: (x) a fee equal to five percent (5%) of the dollar amount of securities purchased by the Accredited Investor introduced by the Advisor or the fair market value of a transaction with the Accredited Investor introduced by the Advisor not involving the sale of securities; plus (y) the number of shares of each class of securities (e.g. common stock, preferred stock, warrants, options) equal to five percent (5%) of the total number of shares issued by or to the Accredited Investor introduced by the Advisor in the Change of Control Transaction, such shares to be issued by the same issuer and in the same class as the shares issued in the Change of Control Transaction. In the event that the Advisor introduces SFM to any person, including without limitation a Accredited Investor, who enters into a licensing or similar agreement with SFM (a "Licensing Agreement"), then SFM shall pay the Advisor an amount equal to ten percent (10%) of the net revenue received by SFM under the Licensing Agreement for the full term of the Licensing Agreement, including any extensions thereof. The parties recognize that time is of the essence with respect to payment of the Advisor's fee. Each party shall bear its own costs and expenses related to the execution, delivery and performance of this Agreement and all documents contemplated hereby, except with respect to the payment of the Advisor's fee as set forth hereinabove.

6. **Prospect Registration Process.** The Advisor and SFM acknowledge that the Advisor has already introduced SFM to Accredited Investors set forth in Schedule "A" attached

**NCL**

Newman Capital LLC

hereto. To the extent that any new prospective Accredited Investors are shown the opportunity to invest in SFM by the Advisor, such Accredit Investors shall be subject to the terms of this Agreement and be added to the list set forth in Schedule "A" attached hereto.

7. **Indemnification.** A party hereto (an "Indemnifying Party") will indemnify and hold harmless the other party hereto and its members, managers, officers, directors, employees, agents and representatives (collectively, the "Indemnified Party") from and against any losses, claims, damages or liabilities to which the Indemnified Party may become subject, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon (a) any untrue statement of a material fact contained (i) in any offering document or any amendment or supplement thereto or (ii) in any filing, or (b) the omission to state in any offering document or any amendment or supplement thereto, or in any filing, a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or omission was made in reliance upon and in conformity with information furnished to the Indemnified Party by or on behalf of the Indemnifying Party specifically for use with reference to the Indemnifying Party or any person acting on its behalf or at its direction in the preparation of the offering documents in question or any such amendment or supplement thereto, or any such filing, or (c) any unauthorized use of sales materials or use of unauthorized verbal representations concerning the securities or the Indemnified Party by the Indemnifying Party, or (d) any failure to comply with this agreement or applicable laws, rules or regulations applicable to such party in connection with the sale of the securities contemplated to be sold in connection herewith, including those regarding money laundering and anti-terrorist financing efforts, applicable FINRA rules, SEC rules and the USA PATRIOT Act of 2001, and will reimburse the Indemnified Party, in connection with investigation or defending such loss, claim, damage, liability or action. This indemnity agreement will be in addition to any liability that the Indemnifying Party may otherwise have.

8. **Confidentiality.** Advisor further agrees that it will maintain the confidentiality of all non-public information received by Advisor related to SFM (the "Information") in connection with the Offering and, unless and until such information shall have been made publicly available by SFM or by others without breach of a confidentiality agreement, shall disclose the Information only as authorized by SFM or as required by law or by order of a governmental authority or court of competent jurisdiction. In the event Advisor is legally required to make disclosure of any of the Information, Advisor will give notice to SFM prior to such disclosure.

9. **Miscellaneous** This letter shall be governed by the laws of the State of New York without regard to conflict of law principles. Any legal action arising out, or relating to, this Agreement and/or any amendment thereto shall be instituted in the state or federal courts sitting in the Borough of Manhattan, State of New York. The parties hereto agree

**NCL**

Newman Capital LLC

to the exercise of exclusive *in personam* jurisdiction over them by the state or federal courts in New York having subject matter jurisdiction. This letter constitutes the entire understanding and agreement between the parties hereto and their respective affiliates with respect to its subject matter and supersedes all prior or contemporaneous agreements, representations, warranties and understandings of such parties (whether oral or written). No promise, inducement, representation or agreement, other than as expressly set forth herein, has been made to or by the parties hereto. This letter may be amended only by written agreement, signed by the parties to be bound by the amendment. Evidence shall be inadmissible to show agreement by and between such parties to any term or condition contrary to or in addition to the terms and conditions contained in this letter. This letter shall be construed according to its fair meaning and not strictly for or against either party.

10. **Assignability**. This Agreement will be assigned by Advisor to a member firm (the "Broker/Dealer") of the Financial Industry Regulatory Authority ("FINRA") prior to the closing of the Offering or a Change of Control Transaction involving the purchase and sale of securities, in accordance with the rules of FINRA. This Agreement may be assigned by SFM with the prior written consent of Advisor or the Broker/Dealer.

11. **Benefit**. This Agreement has been and is made solely for the benefit of the parties hereto and their respective successors, permitted assigns and heirs, and no other person shall acquire or have any right under or by virtue of this Agreement.

12. **Counterparts**. This Agreement may be executed in any number of counterparts. Each counterpart, when executed and delivered, shall be an original contract, but all counterparts, when taken together, shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**NCL**

Newman Capital LLC

**Select Fund Management LLC**

By:

Name: Michael Burke
Title: President
160 West Canyon Crest Road
Alpine, Utah 84004

**Newman Capital LLC**

By:

Name: Stephen R. Newman
Title: CEO
PO Box 321
Short Hills, NJ 07078

**NCL**

Newman Capital LLC

## Schedule "A"

### Newman Capital  Parties Introduced to Private Capital Group "PCG" / Select Fund Management "SFM"

Aberdeen Asset Management

AIG

AI International Corp

Altura Capital

AMB Family Office (Australia)

AMP (Australia)

Appaloosa Management

Apollo Global Management

Ares Management LP

Arden Asset Management

Art Capital Group

Atalaya Capital Management

Australia Future Fund

B2R Financial

Baker Currie

Barrett Family

Berens Capital

Bessemer Trust

Blackrock

Blackstone Partners

# NCL

Newman Capital LLC

Blue Sky (Australia)

Boelte Family

Bollinger Enterprises

BondiT Group

Bostwick Capital

Brasidas Group AG

Candor Family Office (Australia)

Cantor Fitzgerald

Carlson Capital

Castlelake LP

Cerberus Capital Management (Dymas Lending)

Cline Family

CPEX Real Estate

CI Investments Canada

CIFC

CITC Capital Holdings (China)

Coatue Management

Cohen Family (Cohen Private Ventures)

Colony Capital

Colmont Capital (Salandra Family Office)

Comvest Partners

Cravens Brothers

Crestline Investors(Bass Family Office)

Cowen Asset Management

Cross Park Family Office

**NCL**

Newman Capital LLC

Crow Holdings

Crystal Family

Crystal Financial

Cutwater

Czech Asset Management

Davidson Kempner

Deloitte LLP Canada

Dorest Road Partners (Paul Murdock)

East Bridge Real Estate

Eagle Reality Group

Ellington Management group

Enhanced Capital

EOS Capital

Fallbrook Credit

Family Office Association

Family Office Club

Fidelity Investments

Fisher Brothers

Fleck Family

Fortress

Fort Washington/Western & Southern

Fowler Property Acquisition SanFran

Genesis Group

Goff Capital Partners

Goldman Sachs Asset Management

**NCL**

Newman Capital LLC

Goldman Sachs Specialty Lending Group

Golub Capital

Green Drake Corporation

GreenOak Real Estate LP

GSO Capital Partners

GWM Advisors

Hawks Family

Heaton Companies

Holdun Investment Partners

Holowesko Partners

Indigo Asset Management

Innovatus Capital

Jasper Ridge Partners

Jerri Moore Family Office

Kayne Anderson

Keystone Private Wealth ((Australia)

KKR

Kinghorn Holdings LLC- Jose Sanchez

L Investments

LCN Capital Partners

Lexington Partners

Lido Advisors

Lighthouse Investment Partners

Lyxor Asset Management

Madison Partners

**NCL**

Newman Capital LLC

Mariner Investment Group

Matrix Capital Group

Medley Management

Myer Family Office (Australia)

MetLife

Michaud Capital Management

Midmark Capital

MPK Equity Partners (Perot Family Office)

Newhall Family

Newman Capital LLC

Oaktree Capital Management

Och Ziff Capital Management

Olympia Capital Management

Paamco

Paragon Outcomes

PeerStreet

Perella Weinberg Partners

Perpetual Private (Australia)

Peter Kellogg Family Office

Point72 Asset Management

Property Group Partners

Prudential Insurance

Ramius Asset Management

Raven Capital Management

RCG Longview

**NCL**

Newman Capital LLC

RedBird Capital

Redwood Capital (Davis Family)

Related Companies

Richard B duBusc

Ryan Family

SAC Capital

Sasco Capital

Seven Valleys Capital

Sierentz Energy (Louis Dreyfus Family Office)

Siguler Gulf

Singerland Family

Silverpeak Real Estate Partners

Soros

Sound Harbour Partners

Southern Capital Trust (Chile)

Sprott Asset Management LLP Canada

Stabilis Capital

Stamos Capital

Starwood Capital

Stephens Group

Table Top Family Office (Australia)

Taconic Capital

Tennenbaum Capital Partners

THL Credit (Thomas Lee)

Three Ocean Partners

# NCL

Newman Capital LLC

Teneo Holdings

Tiedemann Wealth Management

Tiger Lily Capital (Manning Family Office)

Titan Advisors

Titan Capital ID

Toorak Capital

TowerBrook Capital

Tower Insurance

TPG Sixth Street Partners

TPG Specialty Lending

Triage Funds

Trust Company West (TCW)

Two Sigma

UBS Asset Management

University of Mississippi Endowment

USA Capital

Victory Park Capital

Visium Asset Management

Watts Capital

Wilmington Trust

**Lending Deals**

Ormet Hannibal Ohio

Eastern Consolidated NYC

219 White Pine Canyon Road, Park City Utah

# NCL

Newman Capital LLC

Daufuskie "FAR" Tracks

Gallery Homes 31618 Railroad Canyon Rd Canyon Lake CA

Gentry Walk Bedford Texas

Heaton Companies Atlantic Hotel Fort Lauderdale

Hunters Ridge Ormond Beach Florida

Nevele Resort & Spa Catskill Mountain NY

1452 Broadway San Francisco CA Lot 13 Block 572

Sherman Mills 3502-2508 Scotts Lane Phil PA

South Shore Partners Poipu, Kauai Hawaii